IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROSA DiTUCCI, an individual, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTOPHER J. ASHBY, an individual, et al.,<br><br>Defendants. | ORDER AND MEMORANDUM DECISION GRANTING PREJUDGMENT WRIT OF ATTACHMENT<br><br>Case No. 2:19-cv-277-TC<br><br>Judge Tena Campbell |

The Plaintiffs are individual investors who collectively invested $4.9 million to purchase what they thought was a safe and secure property with guaranteed lease payments. They allege they were victims of Defendants' fraudulent scheme which caused them to lose the value of their investments and left them with tax penalties and other financial problems. The Defendants (a group of interrelated individuals and companies) must now defend against Plaintiffs' causes of action for fraud, securities fraud, sale of unregistered securities, conversion, breach of contract, elder abuse, and unjust enrichment.

Plaintiffs have filed an Expedited Emergency Motion for *Ex Parte* Prejudgment Writ of Attachment (ECF No. 26) targeting a $2.4 million house built and owned by Defendant William "Bil" Bowser. The Plaintiffs asked for expedited consideration because the house—located in Park City, Utah, and referred to as the Glenwild house—was under contract for sale with an

imminent closing date. They asserted that Mr. Bowser, who allegedly misappropriated Plaintiffs' funds, is apparently insolvent or about to become insolvent. They further alleged that if the house (Mr. Bowser's only substantial asset) were sold and converted to cash, they were at risk of losing their remedy for their claim of unjust enrichment (the only claim at issue in this particular proceeding). For these reasons they requested that the court issue a writ *ex parte*.

The court denied the *ex parte* request and held an expedited hearing on the motion, during which both sides addressed the issues. Because key issues were not fully developed, the court imposed temporary restrictions on Mr. Bowser's disposition of the proceeds, ordered supplemental briefing, and held an evidentiary hearing.

Now, having reviewed the evidence and argument from the parties, the court finds, for the reasons set forth below, that the Plaintiffs are entitled to a prejudgment writ of attachment.

## PROCEDURAL BACKGROUND

The court, upon receiving the emergency motion, held an expedited hearing on the Plaintiffs' request for a writ. At that point, the court scheduled an evidentiary hearing. In the interim, the court, with the parties' agreement, issued a temporary order that accomplished the following: Mr. Bowser, who said he was not planning on absconding with the sale proceeds, was allowed to sell the Glenwild house and use a portion of the proceeds to pay two secured liens on the house and costs related to the sale. The remainder of the proceeds were divided into a down payment on a townhome that Mr. Bowser was in the process of purchasing (the "Townhome") (the court allowed that sale to go through as well) and cash that was to be held in a bank account and not spent in any way pending the court's ruling. Mr. Bowser was not allowed to use the sale proceeds to pay two unsecured financial obligations: $170,000 to J&J Construction and $57,000 for three credit card balances.

2

Now, having received further briefing and evidence during the court's June 17, 2019 hearing, the court issues its findings of fact and conclusions of law in support of its ruling granting the request for a writ.

**FINDINGS OF FACT[1]**

Mr. Bowser is President of Defendant Noah's Corporation (Noah), which holds itself out as a developer and operator of events-center properties (e.g., venues that rent space for weddings and receptions). He receives a salary of $180,000. Noah has approximately 500 shareholders and a board of directors consisting of Mr. Bowser and two other individuals. Mr. Bowser is a three-percent shareholder, but only one other person holds more shares than Mr. Bowser. The difference in the amount of shares each holds is slight.

Mr. Bowser also controls Defendant Gabriel Management Corporation (Gabriel), a property management company that was in charge of venue construction. Gabriel is wholly owned by Noah. Mr. Bowser is the only officer of Gabriel and serves as its president.

The Defendants worked together in various roles to sell and manage investments in the events-center properties. The investments consist of Tenant-in-Common (TIC) interests in real property bundled with the lease of an events center (in this case a structure yet to be built) to Noah that in turn is supposed to operate the venue and, from that revenue, pay guaranteed lease payments to the investors.

Defendants Rockwell TIC, Inc. and Rockwell Debt Free Properties (collectively,

---

[1] Given the expedited nature of these proceedings, the court was not able to obtain a transcript of the evidentiary hearing before issuing the order, so it is unable to cite to specific in-court testimony. But much of Ms. DiTucci's and Mr. Bowser's live testimony reiterated statements in their declarations submitted before the hearing and statements made by Mr. Bowser during his June 10, 2019 deposition (albeit memorialized in an uncertified rough draft submitted to the court). The court also emphasizes that the findings here are limited to the prejudgment writ of attachment proceedings.

Rockwell) were the first stop in the investment transaction. According to Mr. Bowser, the transaction occurred (or was supposed to occur) as follows:

> Relative to Noah, generally, Rockwell (or an entity owned and controlled by Rockwell) would acquire real property. It would then enter into a lease agreement regarding that real property with Noah or a subsidiary of Noah. Rockwell would then sell TIC interests in the real property to purchasers. Rockwell would assign its rights in the lease agreement to the TIC purchasers, who would become the landlord of the Noah subsidiary. Rockwell would then distribute remaining funds for construction of event venues to Noah or a construction entity related to Noah. Noah pays rent to a property manager, which distributes those rent payments per each TIC owner's respective interest.

(First Decl. of William Bowser ¶ 8, attached as Ex. A to Bowser's Opp'n to Mot., ECF No. 35-1.)

According to the Plaintiffs, they received Rockwell's sales package (the "Executive Summary, a Property Description, and a Lease Profile") which described the series of transactions and parties involved with the investment. (See First Am. Compl. ¶ 99, ECF No. 4.) When Plaintiffs invested, they expected that their money would be put toward the land purchase and costs to construct the venue. In other words, the money given initially to Rockwell was earmarked for costs incurred by other parties—namely Gabriel and Noah—after being deposited with Rockwell.

Multiple steps in the transaction (essentially, a chain of transactions) were necessary to satisfy the terms of the investment (i.e., the lease payments). Multiple entities, by necessity, worked together to make the investment come to fruition.

But here the Plaintiffs' investment did not come to fruition. The $4.9 million they collectively invested was diverted by Bil Bowser for other purposes. The property they purchased—"Noah's Carmel"[2]—was never developed. It is a vacant piece of land.

---

[2] The property is located in Carmel, Indiana.

Although each entity supposedly had a distinct role in carrying out the investment, it appears that investor money flowed freely among the entities. To begin, Rockwell received the investors' money. The land was purchased. Plans were (supposedly) put into action to construct the events center on that land. To get construction going, Gabriel, the development arm of this group, requested money ("draws") from Rockwell to pay construction costs.[3] In this case, Gabriel took draws from Plaintiffs' money for exterior finishes, roof, doors, windows, landscaping, flooring, sheetrock, insulation, interior finishes, and other construction totaling over $4.9 million. (See Rough Tr. of June 10, 2019 Dep. of Bil Bowser at 80:15-81:2, attached as Ex. 5 to Pls.' Supplemental Brief, ECF No. 41-5; Table of Construction Draws, Evid. Hr'g Ex. AD.) Clearly the draws did not go to Noah's Carmel, which remains a vacant piece of land.

Instead, at Bil Bowser's direction, the money was diverted to pay Gabriel's costs to construct other Noah properties. He admitted as much to the Plaintiffs. During a May 11, 2019 conference call with over 100 owners of properties leased to Noah, including Plaintiffs, Mr. Bowser stated that he had used the money from one project to complete other projects. Between March 18, 2019, and March 22, 2019, Mr. Bowser told Ms. DiTucci and other Plaintiffs that he was "robbing Peter to pay Paul" and that he had used 85-90% of the Noah's Carmel funds to perform work on other buildings under his management with the remaining 10% used for operations and expenses.[4] He said he did so because Gabriel (and Noah, which is now in

---

[3] According to Mr. Bowser, Gabriel is a property management company that develops the Noah properties by "acquiring new properties, entitling new properties, you know, getting permits, holds the construction license, and the – the day-to-day operation of the – of developing property." (Dep. of Bil Bowser at 48:20-23.)

[4] In another statement that demonstrated his loose treatment of money coming into the entities, he admitted that he had used money earmarked to pay taxes on the leases as a "slush fund." (Decl. of Rosa DiTucci ¶ 11, Ex. A to Pls.' Mot.)

bankruptcy)[5] had significant financial problems at the time the Plaintiffs invested their money and the money was needed elsewhere.

He made the decision unilaterally. When asked at the hearing why he did not use the Carmel investors' money to develop the Carmel project and keep that project on track, his only answer was that he put the money where it was most needed to keep those projects afloat. In essence, he said something to the effect of, "you do what you have to do."

Importantly, during the hearing it became clear that Mr. Bowser's family permeates the entities and transactions. Multiple members of Mr. Bowser's family have a financial interest in Noah and Gabriel.

His family dominates roles in Gabriel. In addition to employing Mr. Bowser, Gabriel employs his son-in-law (Scott Jensen) and the brother of that son-in-law (Brandon Jensen), both of whom are project managers. Employee Cory Lowder (superintendent) is the exception. As for principals, Gabriel has three: Mr. Bowser is the President, Scott Jenson is an Officer, and Brandon Jensen is an Officer. (Registered Principal Filing with the State of Utah for Gabriel Management Corporation, Evid. Hr'g Ex. AC.) And on Gabriel's bank account, all of the signatories are related to Mr. Bowser. The signatories consist of Mr. Bowser, Kate Jensen (his daughter), Hailey Gardiner (daughter), Scott Jensen, and Brandon Jensen.

The family connection blends into Noah as well. For instance, his daughters and son have shares in Noah. And his wife receives a salary ($6,583.33 a month, for a total of $79,000 annually) from Noah. (Uniform Residential Loan Application of Mr. and Mrs. Bowser, Evid.

---

[5] On May 28, 2019, less than a month after Plaintiffs filed this suit, Noah and its subsidiaries filed for bankruptcy. Noah's estimated assets are $1 million to $10 million but its liabilities fall somewhere in the range of $10 million to $50 million. It has over 200 creditors, including Mr. Bowser.

Hr'g Ex. AB.) Noah has one bank account which it uses to operate all of its forty-two event venues. (Bowser Dep. at 45:16-21; 47:20-48:1.) There are three signatories on Noah's bank account: Mr. Bowser, Kate Jensen (Mr. Bowser's daughter), and Hailey Gardiner (Mr. Bowser's daughter).

When asked during his deposition how many other relatives are employed by Noah or its subsidiaries, he responded: "I have a niece [named] Samantha Kemp. I have a brother, Mike Bowser. I have a brother Mark Bowser. I have a nephew, Andrew Bowser and then my mom, Marilyn Bowser." (Id. at 97:10-14.)

Based on the evidence seen, it appears that financial controls are loose. Gabriel and Noah share access to a system called Divvy "that is credit card like" but is "not really a credit line. … It's almost more like a debit card if you will." (Id. at 92:7-17.) They use the same Divvy account. "[W]e would be – they would submit a draw for the Divvy amount. So anything that construction used on the Divvy account, we would be treated just like a subcontractor and that amount would be reimbursed to Noah's." (Id. at 93:4-8.) A credit card in the name of Mr. Bowser's wife was used to pay Noah's utilities and funds were transferred directly from the Noah operating account to that credit card. (Id. at 94:13-95:14.)

Money was freely interchanged. For instance, in 2017, Rockwell put $6 million into Noah in an attempt to keep it afloat. And Rockwell, using the Plaintiffs' funds, paid the initial rent payments to the Plaintiffs. "Per Noah's construction agreement with Rockwell, Rockwell made the first nine rent payments out of Noah's budgeted construction draw [which came from the Plaintiffs' payment to Rockwell] to the TIC owners from the date of the Lease Agreement through February 2019, in the aggregate amount of approximately $328,500.00." (SOF ¶ 17 of Bowser Opp'n (citing Bowser First Decl. ¶ 21).) At one point, Mr. Bowser borrowed money

7

from Noah, and he put some of his personal funds into Noah. Mr. Bowser divided his salary up into two parts: one part allocated to the percentage of work he spent on Gabriel business with the remaining part allocated to Noah.

In sum, the record is filled with evidence of interchangeable roles and intermingled money connected to Gabriel, Noah, and the Bowser family.

## ANALYSIS

**Requirements for a pre-judgment writ of attachment**

A prejudgment writ of attachment is intended to preserve the status quo by placing "'the property in the custody of the law to be so held until the court determines whether or not [Plaintiffs] in the action [are] entitled to judgment in the main case.'" Blackmore v. L&D Dev., Inc., 274 P.3d 316, 316 (Utah Ct. App. 2012) (emphasis omitted) (quoting Bristol v. Brent, 103 P. 1076, 1079 (1909)). To obtain a prejudgment writ of attachment, the Plaintiffs must satisfy seven criteria set forth in Rules 64A and 64C of the Utah Rules of Civil Procedure.[6]

First, they must show that (1) the property is not earnings and not exempt from execution; (2) the writ is not sought to hinder, delay or defraud a creditor of the defendant; and (3) there is a substantial likelihood that the plaintiffs will prevail on the merits of the underlying claim. Utah R. Civ. P. 64A(c)(1)–(c)(3). They must also show that "the defendant has assigned, disposed of or concealed, or is about to assign, dispose or conceal, the property with intent to defraud creditors; **or** probable cause of losing the remedy unless the court issues the writ." Utah R. Civ.

---

[6]Rule 64 of the Federal Rules of Civil Procedure (titled "Seizing a Person or Property") provides that "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies." Fed. R. Civ. P. 64(a). Because a federal statute does not apply in this situation, the court looks to Utah rules to determine whether the Plaintiffs are entitled to a writ of attachment of the proceeds from the sale of the Glenwild Property.

P. 64A(c)(7) and (c)(10) (emphasis added). Finally, they must satisfy three elements set forth in Rule 64C: (1) the defendant is indebted to the plaintiff; (2) the action is upon a contract; and (3) payment of the claim has not been secured by a lien upon property in this state.

Some of the requirements are easily established and it does not appear that Mr. Bowser contests them. In particular, Plaintiffs have shown that (1) the property is not earnings and is not exempt from execution (such property includes burial plots, health aids, disability, veterans or unemployment benefits, child support, alimony or maintenance, insurance proceeds, and personal works of art)[7]; (2) they are not seeking the writ to hinder, delay or defraud creditors; and (3) payment for Plaintiffs' unjust enrichment claim "has not been secured by a lien upon property in this state." (See Pls.' Mot. at 11–12, 16; Def.'s Opp'n to Mot. at 10, 12–16.) The remainder of the elements are disputed.

**Substantial Likelihood of Prevailing on the Claim of Unjust Enrichment**

Unjust enrichment has three elements: (1) "a benefit conferred on one person by another," (2) "the conferee must appreciate or have knowledge of the benefit," and (3) there must be "the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." Desert Miriah, Inc. v. B & L Auto, Inc., 12 P.3d 580, 582 (Utah 2000).

Plaintiffs contend that they collectively conferred a benefit upon Mr. Bowser by transferring more than $4.9 million to Rockwell, of which $3 million was then disbursed to and accepted by Mr. Bowser. Mr. Bowser transferred that money to prop up other struggling Noah investment properties. That, Plaintiffs say, was a windfall to Mr. Bowser, who, without Plaintiffs' knowledge or consent did not use the money for purposes related to Noah's Carmel.

---

[7] Utah Code Ann. § 78B-5-505.

For that reason, they assert it would inequitable for him to retain the benefit of the proceeds without re-payment of the value. Because Mr. Bowser's only significant assets are the Townhome and the net proceeds of the sale of the Glenwild Property (which is substantially less than the $3 million Plaintiffs seek under their unjust enrichment claim), his receipt of proceeds of the sale of that property is the only way the Plaintiffs may obtain at least part of that $3 million.

Mr. Bowser contends that the Plaintiffs have not shown a substantial likelihood of success on the merits for three reasons. First, he asserts that they have not established the elements of unjust enrichment. Second, Plaintiffs have a legal remedy, which forecloses the equitable remedy of unjust enrichment. Third, the actual harm (which he characterizes as unpaid rent payments) "does not approximate the damages they seek." (Def.'s Opp'n to Mot. at 12.)

<u>The Elements of Unjust Enrichment</u>

*Conferring a Benefit on Mr. Bowser*

Mr. Bowser argues that Plaintiffs did not confer a benefit on him because (1) they paid Rockwell, not Gabriel, and (2) the money was drawn and transferred by Mr. Bowser solely in his corporate role as President of Gabriel and Noah (in other words, they cannot pierce the corporate veil of Noah or Gabriel). As noted below, the court finds that Mr. Bowser was the alter ego of Gabriel, so what Gabriel received was really a payment to Mr. Bowser.

Mr. Bowser's challenge to the first element of the Plaintiffs' unjust enrichment claim (i.e., the benefit conferred) is based on an unnecessarily strict reading of the element. He does not consider the multi-part nature of the Noah's Carmel investment or the fluidity of transactions and links between Rockwell, Gabriel, and Noah.

A similar argument was rejected in <u>Desert Miriah v. B & L Auto, Inc.</u>, 12 P.3d 580 (Utah 2000). There, the Utah Supreme Court analyzed whether the claimant, Mr. Denning, conferred a

10

benefit on the "conferee," Desert Miriah. In that case, after a convoluted series of loan transactions, Mr. Denning lost $50,000 he had loaned to a third party in connection with Desert Miriah's purchase of a houseboat. Mr. Denning sought $50,000 from Desert Miriah through a claim for unjust enrichment. Desert Miriah argued that it did not receive a benefit from Mr. Denning because the money was paid to a third party. In other words, it asserted that it was not the "conferee" because any benefit Desert Miriah may have received in connection with Mr. Denning's loan to another was indirect and so not actionable. The Court disagreed and found that Mr. Denning's loan to the third party ultimately allowed Desert Miriah to avoid seizure of the houseboat. "The benefit to plaintiff in this case was not so far removed from Denning's actions as to find that Denning did not confer a benefit on [Desert Miriah] in making the loan." Id. at 583.

Here, Plaintiffs paid money to Rockwell as part of a plan that would funnel the money to construction and operation of the venue by Gabriel and Noah. Given the investment's structure, a payment to Rockwell does not foreclose a finding that Gabriel, which was interconnected with Rockwell and Noah and formed a necessary link in the chain of events, received Plaintiffs' money.

Furthermore, even though the money went to Gabriel's account, Mr. Bowser, not Gabriel, was the conferee. As discussed below in the court's "alter ego" analysis, when Mr. Bowser took draws on the Plaintiffs' investment money, he was not acting in his role as an agent of the corporation. He was the alter ego of Gabriel and so, in essence, was the conferee.

And he benefited from the money. He used the money in an attempt to keep Gabriel operating successfully and to keep struggling Noah projects afloat. He benefited from that

11

transfer because the success of Gabriel and Noah (albeit fleeting) protected not only his financial interests, but the direct financial interests of multiple members of his family. [8]

*Knowledge of Benefit*

This element is easily established. Mr. Bowser knew that the funds he pulled from Rockwell and diverted were the Plaintiffs' investment money and that his use of that money to protect other projects was improper. As noted above, he told Ms. DiTucci and other Plaintiffs that he had diverted the Noah's Carmel funds to perform work on other Noah buildings. (See Decl. of Rosa DiTucci ¶ 10 ("Bowser told me and other Plaintiffs that he was 'robbing Peter to pay Paul' and had used 85-90% of the funds from Noah's Carmel investors to perform work on other buildings under his management, and the remaining 10% was used for operations and expenses."), ECF No. 26-2.)

*Inequitable to Retain Benefit Without Payment of its Value*

Plaintiffs paid that money to Rockwell to purchase land and fund Noah's Carmel in exchange for regular lease payments. Their money was used on other projects. Noah's Carmel has not been built. The property is vacant land, and its value is significantly less than their investment. It would be inequitable to allow Mr. Bowser to avoid paying the money he personally diverted.

<u>Legal v. Equitable Remedy</u>

Mr. Bowser asserts that Plaintiffs have a legal remedy (i.e., recovery under contract) and so they are not allowed to obtain the equitable remedy of unjust enrichment. See Am. Towers

---

[8] Indirect financial interests existed as well. Before the Plaintiffs filed their motion, Mr. Bowser had plans to use a substantial amount of the liquidated sales proceeds of his house to pay an unsecured loan to J & J Construction for building the Glenwild Property. J & J Construction is owned by Scott and Branden Jensen, who, in addition to being related to Mr. Bowser through marriage, are Gabriel employees, Gabriel officers, and signatories on Gabriel's bank account.

Owners Ass'n, Inc. v. CCI Mech., Inc., 930 P.2d 1182, 1193 (Utah 1996) ("[I]f a legal remedy is available, such as breach of an express contract, the law will not imply the equitable remedy of unjust enrichment."). According to him,

> [a]lthough … Plaintiffs do not have a contract with Bowser personally, they do have contracts with Noah: the Lease Agreement and the Purchase and Sale Agreement. Through these documents, Plaintiffs have a bargained-for outcome for their purchase of the Carmel Property, reduced to writing: ownership of the property as tenants in common, and monthly rent payments.

(Def.'s Opp'n to Mot. at 11.) But Plaintiffs have not alleged a breach of contract claim against Gabriel or Mr. Bowser. Accordingly, any contract they may have with Noah (or Rockwell, for that matter) does not bar their unjust enrichment claim against Mr. Bowser.

### Nature of Damages

Finally, Mr. Bower's characterization of Plaintiffs' damages as lost rent payments is not persuasive. Plaintiffs lost $3 million when Mr. Bowser diverted those funds to uses other than Noah's Carmel. That is their damage. They are not seeking unpaid rent from Mr. Bowser.

### Piercing the Corporate Veil of Gabriel

Mr. Bowser, through Gabriel, ordered draws of the Plaintiffs' money from Rockwell. Because the money was transferred to Gabriel, and then to Noah projects, Mr. Bowser, who was acting as President of both Gabriel and Noah, argues he does not have personal liability for the transfers. In response, Plaintiffs present evidence that Gabriel was the alter ego of Mr. Bowser and argue that Mr. Bowser should not be allowed to hide behind the corporate entities he used to transfer the money.

Utah employs a two-prong test to determine whether a party may pierce the corporate veil. First, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." In other words, "the corporation is, in fact, the alter ego of one or a few individuals." Norman v. Murray First Thrift & Loan Co., 596 P.2d

13

1028, 1030 (Utah 1979), quoted in Jones & Trevor Mktg. v. Lowry, 284 P.3d 630, 635 (Utah 2012).  Second, "the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow."  Id.

The court may consider eight non-exclusive factors in determining whether to pierce the corporate veil:

> (1) undercapitalization of a one-man corporation;
> (2) failure to observe corporate formalities;
> (3) nonpayment of dividends;
> (4) siphoning of corporate funds by the dominant stockholder;
> (5) nonfunctioning of other officers or directors;
> (6) absence of corporate records;
> (7) the use of the corporation as a façade for operations of the dominant stockholder or stockholders; and
> (8) the use of the corporate entity in promoting injustice or fraud.

Colman v. Colman, 743 P.2d 782, 786 (Utah Ct. App. 1987).  But these factors "are merely helpful tools and not required elements."  Jones & Trevor Mktg., 284 P.3d at 636.

To begin, Gabriel was a "one-man corporation."  Mr. Bowser was the sole officer and acted as President.  He employed his family members.  He and his family members controlled the bank accounts. He managed Gabriel without oversight from Noah (unless one characterizes his role as Noah's President as a form of oversight, which would be an illogical result).

Gabriel was losing money at the time the Plaintiffs invested in Noah's Carmel.  After the Plaintiffs paid Rockwell, Gabriel essentially gave the $3 million in construction draws to Noah (or spent them on construction of other Noah properties).  The diversion of Plaintiffs' funds meant that Gabriel was unable to complete its obligation to construct the Noah's Carmel building.

There was no evidence that Gabriel observed corporate formalities.  Mr. Bowser was the only principal of Gabriel and he simultaneously served as President of Noah.  He wore two hats

as he carried out the transactions. And, according to the record before the court, the flow of money between Rockwell, Gabriel, and Noah was not checked by financial controls.

Mr. Bowser's salary reflects the lack of respect for the corporate form. He explained how he drew a salary from Gabriel and Noah. "[I]t doesn't matter what entity it is. And I found myself – I didn't think it was an accurate, necessarily, display of my salary all in Noah's, so we bifurcated it into some of it from Gabriel and some of it from Noah's because that's how I was spending my time." (Bowser Dep. at 105:1-9.)

All of this shows that there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist."

As for the other prong of the test, the court finds that allowing Mr. Bowser to hide behind the shell of Gabriel would sanction his act of diverting the Plaintiffs' money, which would "promote injustice" and allow an "inequitable result." Norman, 596 P.2d at 1030.

For the foregoing reasons, Plaintiffs have established the likelihood of success on their unjust enrichment claim against Mr. Bowser who is the alter ego of Gabriel.

**Intent to Defraud Creditors or Probable Cause that Remedy Will Be Lost**

Mr. Bowser is correct that Plaintiffs have not shown that he "has assigned, disposed of or concealed, or is about to assign, dispose of or conceal, the property with intent to defraud creditors."[9] But Plaintiffs have established the alternative element: "probable cause of losing the remedy unless the court issues the writ."

---

[9] Plaintiffs contend that the Defendants were operating a Ponzi scheme because the Defendants, and particularly Mr. Bowser, were using funds from new investors to cover costs for projects and lease payments to earlier investors. They then suggest that the court may find that a Ponzi scheme exists and apply "the Ponzi presumption" to find all the transfers from Gabriel to Noah are, as a matter of law, presumed to be fraudulent. (See Pls.' Supplemental Brief at 14–15, ECF No. 41.) The court declines to reach this issue because it has not been sufficiently developed in the pleadings.

As Plaintiffs note, "Based upon Bowser's financial situation and commingling of funds, Plaintiffs will lose their sole remedy [for the unjust enrichment claim] unless the Court issues the writ." (Pls.' Mot. at 14.) Mr. Bowser has no other assets to attach (he testified that the Townhome, remaining proceeds of the sale, and proceeds from the sale of one car were his only assets). He cannot satisfy a judgment against him.

**Indebted to Plaintiff**

Plaintiffs must establish that Mr. Bowser is indebted to them. Utah R. Civ. P. 64C(b)(1). Although there is little Utah law on the meaning of "indebted to," a case in this district recently addressed this requirement, at least in part. In First Guaranty Bank v. Republic Bank, Inc., the court first noted that "the indebtedness requirement cannot mean that the plaintiff must have a judgment in hand before it can qualify for a writ of attachment. Such an interpretation would render meaningless the prejudgment remedy provided in Rule 64A." 303 F. Supp. 3d 1200, 1209 (D. Utah 2017). But it also held that "the indebtedness requirement must require something more than the assertion of a legal claim for recovery for which there is a substantial likelihood of success." Id. at 1209 (looking to analogous Texas law, "which has long included a similar 'justly indebted' requirement to issue a writ of attachment").

The party advocating for the writ in that case argued that the phrase "indebted to" "should be read to mean 'an obligation to pay a <u>liquidated</u> sum on an express or implied contract' or an obligation to pay an unliquidated sum 'if the underlying contract provides a rule for ascertaining such damages.'" Id. (emphasis in original) (quoting In re Argyll Equities, LLC, 227 S.W.3d 268, 271 (Tex. App. 2007)). Although the First Guaranty court did not directly address that contention, it did quote analogous Texas case law with approval, which provided that "'[a]ttachment is not appropriate if the amount of the claim is so uncertain that a jury must

16

determine the final amount of damages.'" Id. (quoting In re Argyll Equities, 227 S.W.3d at 271). The concern appears to be whether the amount of indebtedness is easily ascertainable. Here, there is a clear measure of the money diverted: $3 million of the Plaintiffs' funds that were diverted by Mr. Bowser. Accordingly, the court finds that the Plaintiffs have shown that Mr. Bowser is indebted to them because the obligation is liquidated.

**An Action Upon a Contract**

Plaintiffs must also show that "the action is upon a contract."[10] Utah R. Civ. P. 64C(b)(2)(i). They assert that they have established this requirement because unjust enrichment is a "contract implied in law." Jones v. Mackey Price Thompson & Ostler, 355 P.3d 1000, 1012 (Utah 2015). The language of the rule does not differentiate between implied and express contracts, and it does not differentiate between an implied-in-fact contract and an implied-in-law contract. Mr. Bowser has not provided persuasive argument that forecloses Plaintiffs' proposition that "contract" can extend to a contract recognized in equity under the unjust enrichment cause of action. Accordingly, the court finds that Plaintiffs have satisfied this requirement.

**ORDER**

For the foregoing reasons, the Plaintiffs' Expedited Emergency Verified Motion for *Ex Parte* Prejudgment Writ of Attachment (ECF No. 26) is GRANTED. By this order, the court issues a prejudgment writ of attachment on the net proceeds of the sale of the Glenwild Property (totaling $844,816.83), described as follows: the Townhome described in Mr. Bowser's initial opposition brief (ECF No. 35) (or, alternatively, the proceeds earmarked for its purchase, which

---

[10] In the alternative, a party must show that the action "is against a defendant who is not a resident of this state or is against a foreign corporation not qualified to do business in this state" or "the writ is authorized by statute." Utah R. Civ. P. 64C(b)(2). Neither apply here.

total $496,995.36) and the remainder of the unencumbered proceeds ($347,821.48). Mr. Bowser is ORDERED to deposit $347,821.48 with the court. It is further ORDERED that he and Mrs. Bowser may not transfer the Townhome, or any interest in the Townhome. If the Townhome sale does not go forward (the sale had not closed at the time the court held the evidentiary hearing), Mr. Bowser may not transfer the $496,995.36 in any way without express permission from the court (for instance, if he has to use the funds to purchase a different piece of property, he must petition the court for permission to do so).

DATED this 24th day of June, 2019.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge