Wes Felix (#6539)
Brenda Weinberg (#16187)
FELIX WEINBERG PLLC
68 South Main Street, Suite 800
Salt Lake City, Utah 84101
Tel: (801) 441-0439
wfelix@felixweinberg.com
bweinberg@felixweinberg.com
*Attorneys for the Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROSA DiTUCCI, an individual; STEVEN R. LaROZA, an individual; DEBRA A. LaROZA, an individual; BRUCE I. ROSE, an individual; MAUREEN A. ROSE, an individual; SANFORD ROBERTS, an individual; HELAINE B. ROBERTS, an individual; RUSSELL E. HERTRICH, an individual; FRED JACOB, an individual; EDWARD A. HENNESSEY, an individual; RUSSELL E. HERTRICH REVOCABLE TRUST; SANFORD ROBERTS REVOCABLE TRUST;HELAINE B. ROBERTS REVOCABLE TRUST; THE FRED JACOB LIVING TRUST; EDWARD A. HENNESSEY 2001 REVOCABLE LIVING TRUST; CAMAC, INC., a Kansas corporation; and BLUSH PROPERTY, LLC., a Florida limited liability company; <br><br> *Plaintiffs*, <br><br> vs. <br><br> CHRISTOPHER J. ASHBY, an individual; JOHN D. HAMRICK, an individual; JORDAN S. NELSON, an individual; SCOTT W. BEYNON, an individual; WILLIAM BOWSER, an individual; SCOTT RUTHERFORD, an individual; | **THIRD AMENDED COMPLAINT** <br><br><br> Case No. 2:19-cv-00277 <br><br><br> The Honorable Tina Campbell <br><br> Jury Trial Demanded |

|  |  |
|---|---|
| ROCKWELL DEBT FREE PROPERTIES, INC., a Utah Corporation; ROCKWELL TIC, INC., a Utah Corporation; NOAH CORPORATION, a Utah corporation; EDMUND AND WHEELER, a New Hampshire corporation; ROCKWELL INDIANAPOLIS, LLC, a Utah limited liability company; GABRIEL MANAGEMENT CORPORATION, a Utah corporation; KIRSTEN PARKIN, an individual; FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation; JOHN DOES I-X, and ROE CORPORATIONS I-X, | |
| *Defendants.* | |

COMES NOW Plaintiffs ROSA DiTUCCI, an individual; STEVEN R. LaROZA, an individual; DEBRA A. LaROZA, an individual; BRUCE I. ROSE, an individual; MAUREEN A. ROSE, an individual; SANFORD ROBERTS, an individual; HELAINE B. ROBERTS, an individual; RUSSELL E. HERTRICH, an individual; FRED JACOB, an individual; EDWARD A. HENNESSEY, an individual; RUSSELL E. HERTRICH REVOCABLE TRUST; SANFORD ROBERTS REVOCABLE TRUST ; HELAINE B. ROBERTS REVOCABLE TRUST; THE FRED JACOB LIVING TRUST; EDWARD A. HENNESSEY 2001 REVOCABLE LIVING TRUST; CAMAC, INC., a Kansas corporation; and BLUSH PROPERTY, LLC, a Florida limited liability company (hereinafter "Plaintiffs"), by and through undersigned counsel, hereby complain, state, and allege as follows:

## INTRODUCTION AND BACKGROUND

1.      This action involves a fraudulent scheme by sophisticated promoters, real estate brokers, a title insurance company and an event venue operator who conspired to sell to unsuspecting investors interests in profitable event venues represented to be managed by an independent third-party entity.  Each event center was represented to be a financially separate and independent investment and these investments were represented to have a solid track record of returns in the neighborhood of ten (10) percent per annum.  These representations were false and mispresented both the true nature of the investment and concealed the substantial risk to investors due to, among other things, the precarious financial position of the Defendants.

2.      Defendants sold the Plaintiffs a beautiful event center in Carmel, Indiana that Defendants purported to be either under construction or already constructed. The building, however, was neither under construction nor constructed, and Plaintiffs were sold vacant land. In addition, Plaintiffs were promised that invested money would be held in escrow by First American Title Insurance Company ("FATCO") and disbursements would be made only for the purchase of land and for incremental completion of the event center.  Instead, Kirstin Parkin and FATCO immediately disbursed all invested funds to their co-conspirators who then simply spent the money and performed no construction.

3.      The Carmel investments were structured as undivided Tenant-in-Common ("TIC") interests in the real property located at 13315 Illinois Street, Carmel, Indiana ("Noah's Carmel") bundled with a lease of the Property to Noah Corporation ("Noah's"), an entity controlled by one of the Defendants, who would operate it.

4.      Under the TIC structure, investors would be allowed to purchase undivided TIC interests in Noah's Carmel as small as $150,000, thereby enabling Defendants to spread the massive purchase price over a large group of unsuspecting purchasers.

5.      Defendants sold approximately 40 other investment properties with similar structures.

6.      The sale and lease with a third-party management structure enabled Defendants to target relatively unsophisticated investors with little knowledge of or experience in the commercial real estate business. Defendants sold these securities to investors nationwide. Defendants told potential investors that the event venue would be operated and managed by Noah's, who held themselves out as experts in the field supposedly committed to the success of the venture and with a lengthy history of stable profitability.

7.      Contrary to the representations made by many of the Defendants to Plaintiffs, the event venues were not operated as financially independent entities, and funds from one investment were used to prop up others.  Indeed, Defendants Rockwell and Noah's ran the business as a single integrated enterprise, comingling investor funds and operational revenue. Older investment venues paid steady returns to investors, not on the basis of successful management and profitability, as represented by Defendants, but through cash generated by new investments.  These facts were not disclosed to Plaintiffs.

8.      Defendants' scheme worked. The investors who purchased Rockwell investments in Noah's Carmel are ordinary people, including several retirees, who purchased their interests through Rockwell Debt Free Properties, Inc. and Rockwell TIC, Inc. (collectively, "Rockwell"), and Rockwell Indianapolis, LLC.  The Rockwell entities used finders or feeders such as Hamrick to steer investors to the Rockwell investments.   E&W, Hamrick and Brown received

commissions of 5% on the sale of Noah's TIC securities. The Defendants lied to or failed to disclose that total commissions on the sale of these securities reached as high as 20% of the invested funds.

9.      Plaintiffs are individuals and entities whose owners/members are comprised of mostly older, retired individuals who collectively invested nearly $5 million dollars to purchase investments in the Noah's Carmel operation. The investment was sold as a TIC investment or 1031 Exchange -- a reference to Section 1031 of the Internal Revenue Code. Section 1031 allows individuals who have earned capital gains from the sale of real estate to legally defer paying federal taxes on those capital gains when they are re-invested in a qualifying property.

10.     Plaintiffs were fraudulently induced to purchase the TIC investments by Rockwell or agents working on Rockwell's behalf, including but not limited to John D. Hamrick ("Hamrick") and Chris Brown ("Brown") at Edmund and Wheeler ("E&W").  These Defendants made false and misleading representations or omitted information concerning the value of the TIC Interests, the historical operating experience of the Noah's event venues, and the nature of the risk associated with the TIC securities.

11.     The E&W defendants, and particularly Hamrick, were in continuous contact with Rockwell and Noah's.  Hamrick met at least twice annually with Rockwell and Noah's.  The parties held an annual February marketing and strategy event in Arizona.  The parties also met annually at Rockwell's Christmas party.  Hamrick, Bowser and the Rockwell Defendants were active participants in the creation of marketing materials and marketing strategies and were all involved in strategic planning of how to run the real estate holdings.

12.     E&W, Hamrick and Brown knew or were reckless in not knowing that: a) the Noah's leases were not profitable; b) that the Noah's leases were not market rate; c) that Noah's

was insolvent by at least January of 2017; d) that in 2018 invested money was being used to prop up other properties; and, e) that the TIC investments as they were structured and implemented did not qualify as valid 1031 exchanges.

13.     Hamrick was also involved in decisions as to how the properties should be developed and managed.  For example, in the summer of 2016 Hamrick presented a PowerPoint presentation in Utah describing how he believed Cadence could better manage the properties purchased by TIC securities investors.

14.     Kirstin Parkin ("Parkin") was employed by FATCO.  Parkin regularly communicated with Rockwell, who was a significant client, and participated in closings for more than 400 investments for Noah's alone, not including other Rockwell investments such as Fresenius and KinderCare TICs. Parkin understood that invested funds for construction TICs were to be held by FATCO and not disbursed until an appropriate level of construction was completed.  Parkin and FATCO ignored these fiduciary obligations and disbursed funds whenever instructed to do so by Rockwell or Bowser.  In addition, Parkin and FATCO facilitated the deception of Plaintiffs: 1) by representing to Plaintiffs that invested funds would be held safely in escrow and not fully disbursed until construction was completed; 2) closing on the sale of TIC interests before the subject property was owned by the seller Rockwell; 3) lying to Plaintiffs and telling them that they did not receive deeds to the property immediately after closing because the deeds had been "lost in the mail" or "misfiled;" 4)  sending the deeds after closing to Rockwell and not timely recording them to assist in the deception that the purchases were somehow 1031 compliant; 5) withholding legally required documents from Plaintiffs at closing including legally mandated Indiana real estate disclosure forms (Indiana State Disclosure Form "ISDF").  Parkin and FATCO's misconduct was done at the direction of Rockwell for the

purpose of furthering the Defendants' conspiracy to defraud Plaintiffs. As a result of Parkin and FATCO's breach of their fiduciary duties, all of the funds invested by Plaintiffs were disbursed to FATCO's co-conspirators immediately upon closing, and the entire sum was misappropriated by Defendants. Parkin and FATCO's overt acts in furtherance of the conspiracy substantially aided and assisted in Defendants' fraud. Indeed, Defendants' misappropriation of Plaintiffs' funds could not have occurred without the knowing participation of FATCO in the fraudulent scheme.

15. The information misrepresented to or concealed from Plaintiffs was material to their decisions to invest. Plaintiffs relied upon, among other things, the Sales Package prepared and disseminated by Defendants, principally Rockwell, Christopher J. Ashby ("Ashby"), Jordan S. Nelson ("Nelson"), Scott W. Beynon ("Beynon"), Scott Rutherford ("Rutherford"), E&W, Hamrick, and Brown in deciding to invest in the TIC Interests, and would not have invested in the TIC Interests had the true facts and risk factors relevant to the investment been fully and accurately disclosed to them. If FATCO's misconduct had been disclosed, Plaintiffs would not have invested in the fraudulent securities because it would have been apparent that the TIC interests would not qualify for 1031 treatment.

16. Beynon was instrumental in determining the content of the sales materials as Vice President of Marketing for Rockwell. He was primarily responsible for creating the Sales Package.

17. Rutherford was instrumental in determining the content of the sales materials as Vice President of Marketing for Rockwell.

18.     After Plaintiffs purchased Noah's Carmel, Defendant William "Bil" Bowser ("Bowser") and others misappropriated some or all of the $6.26 million collected that was to be used for construction.

19.     Plaintiffs collectively invested approximately $4.9 million, and other investors invested the remaining $1.36 million.

20.     Bowser directly misappropriated a portion of these funds, among other things, for operations, to pay debts, and to be used by Bowser's construction company, Gabriel Management Corporation ("Gabriel Construction") to complete construction on other Rockwell properties. Bowser also directly misappropriated approximately $500,000 to use in the construction of his home in Park City, UT.

21.     All of the Defendants concealed from Plaintiffs that individual event venues were not independent financial entities, but funds from one investment entity were used for other properties; that Noah's was, in fact, a Ponzi scheme.  Earlier investors were paid with proceeds from new investments to create the illusion of a profitable enterprise.  In reality, Noah's was insolvent at least by January 1, 2017 and by the end of 2017 Noah's financials reflected some $57 million in operating losses.  All of these facts were hidden from Plaintiffs by Defendants.

22.     Plaintiffs never realized the benefits of their TIC investment because, among other reasons, Defendants Ashby, Bowser, and Nelson, the individuals who owned and/or controlled the TIC investment sponsors, Rockwell, Rockwell Indianapolis, and Noah's misappropriated at least $4.9 million from Plaintiffs' properties.

23.     As alleged below, Defendants were only able to steal millions of dollars from Plaintiffs because they had the help of others, including Defendants Gabriel Construction, LeFevre Management, Inc. d/b/a Cadence Property Advisors d/b/a Cadence Property

Administrators ("Cadence"), Scott B. LeFevre ("LeFevre"), E&W, and E&W's employees Hamrick and Chris Brown ("Brown"), who all received undisclosed commissions from Plaintiffs' investments.  These Defendants knew or were reckless in not knowing that the Carmel property was not constructed and was worth far less than its represented fair market value, and that investment funds were misappropriated in the amount of more than $4.9 million.  Hamrick, in particular, who is a self professed expert 1031 Qualified Intermediary, knew that the Carmel property was not built and that it could not be built within the 180-day time frame required for 1031 exchanges.

24.     Bowser and Gabriel management, Bowser's alter ego, directly misappropriated at least $3,000,000 from Plaintiffs' investment.

25.     All Defendants concealed or failed to alert Plaintiffs as to the misappropriation and fraud.

26.     In March 2019, Bowser abruptly announced that Noah's would stop making rent payments to Plaintiffs.  In May of 2019, Noah's declared bankruptcy.

27.     Cadence provided property administrator services for Noah's Carmel that is the subject of this Complaint. LeFevre is the Principal of Cadence and a licensed real estate agent who managed Noah's Carmel. Among Cadence's duties were the collection of funds from Noah's and/or Rockwell, disbursement of those funds to Plaintiffs and other investors as "rents," reporting of rent statements to Plaintiffs and other TIC owners to an online portal, and issuing IRS Form 1099-MISC, Miscellaneous Income to Plaintiffs and other investors. Cadence did not, however, control or manage the day-to-day operations at Noah's Carmel. Instead of preventing, stopping, or alerting Plaintiffs about the misappropriation, Cadence and LeFevre actively assisted Ashby, Bowser, Nelson, and Rutherford to continue and conceal the misappropriation.

28.     Hamrick, a Vice President of E&W from 2000 to the present, is a licensed real estate professional and Qualified Intermediary ("QI") who provided QI services, among other things, to 1031 investors. He introduced the 1031 investors who relied upon E&W, Hamrick, and Brown as professionals with a fiduciary duty to act in the best interests of their 1031 clients, to Rockwell and Noah's investments.  Hamrick concealed the failure of Rockwell and Noah's to commence construction and concealed the misuse of funds from the investment.  Hamrick misrepresented the 5% commission he earned on the sale of TIC securities telling investors he received a flat $700 fee. Hamrick also falsely stated that TIC investments were not securities under state and federal law.  Hamrick actively induced many Plaintiffs and other investors to purchase securities in Rockwell properties by recommending TIC interests, liaising between Rockwell and investors, and acting as QI for some Plaintiffs. Hamrick knew that a valid 1031 exchange required that the substitute property be constructed within 180 days of the sale of the original property and he knew the Carmel building could not be constructed within that time-frame.

29.     As a result of the misappropriation facilitated and concealed by the Defendants, Plaintiffs have suffered or will suffer more than $4.9 million in damages from loss of their investment principal alone. Plaintiffs also suffered additional losses arising from unpaid monthly "base rents" or distributions due on their investments. Plaintiffs also face potential tax-related losses.

## SUBJECT MATTER JURISDICTION

30.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (The "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because Plaintiffs' claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. §§

78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, and under Section 12 of the Securities Act of 1933 (the "Act")  15 U.S.C. § 77l.

31.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims that arise under the laws of the State of Massachusetts, the State of New Hampshire, the State of California, the State of Indiana, the State of Florida, the State of Maine, and the State of Kansas.

## PERSONAL JURISDICTION

32.     This Court has personal jurisdiction over Defendants pursuant to Section 78B-3-205, Utah Code, because Defendants committed tortious acts in the State of Utah stemming from the facilitation or intentional misappropriation of at least $4.9 million, causing substantial damages to Plaintiffs. Defendants perpetrated the misappropriation, facilitated the misappropriation, concealed the misappropriation, and/or failed to alert Plaintiffs to the misappropriation despite a duty to do so.

33.     This Court also has personal jurisdiction over Defendants pursuant to Section 78B-3-205, Utah Code, because the Complaint alleges that Defendants were members of a civil conspiracy and that one or more of the Defendants committed tortious acts in Utah in furtherance of the conspiracy.

34.     This Court has personal jurisdiction over all Defendants as residents of the United States against whom Plaintiffs have asserted federal securities law claims pursuant to 15 U.S.C. §§ 77(v)(a) and 78aa.

35.     This Court has general personal jurisdiction over Defendants Ashby, Nelson, Beynon, Rutherford, and Bowser pursuant to Section 78B-3-307, Utah Code, because Defendants are residents and/or domiciled in Utah.

36.     This Court has general personal jurisdiction over Defendants Rockwell Debt Free Properties, Inc., Rockwell TIC, Inc., Rockwell Indianapolis, LLC, Noah Corporation, Gabriel Construction, and FATCO because these Defendants are registered to conduct business in Utah and maintain Registered Agents in Utah.

37.     This Court has personal jurisdiction over Defendants sufficient to satisfy Constitutional due process because each Defendant has sufficient minimum contacts with the United States and the State of Utah with respect to the subject matter of this action, such that each could reasonably anticipate being haled into court in this forum.

38.     Hamrick's minimum contacts include but are not limited to:

a.  Hamrick resides in New Hampshire and therefore has the relevant minimum contacts with the United States;

b.  Organizing, recommending, and promoting investments with Utah individual and entity Defendants Ashby, Nelson, Beynon, Bowser, Rutherford, Rockwell, Noah's, Rockwell Indianapolis, and Gabriel Construction that are the subject of this Complaint,

c.  Facilitating contractual agreements between Plaintiffs and Utah entities Rockwell Indianapolis and Cadence in furtherance of the acts that are the subject of this Complaint,

d.  Making numerous trips to Utah for both personal and business purposes that are the subject of this Complaint including for annual Rockwell Christmas functions,

to strategize and disseminate marketing and other plans, and to visit personally with Chris Ashby, among others, including attending numerous religiously related functions.

e.   Causing false and misleading rental calculators to and from Utah related to the property that are the subject of this Complaint,

f.    Sending and receiving numerous emails to and from Utah Defendants Ashby, Nelson, Beynon, Rutherford, Rockwell, and Cadence, oftentimes with Plaintiffs as parties to the email exchange, and

g.   Receiving funds as commission for the sale of property owned by Rockwell Indianapolis, a Utah entity.

39.   Brown's minimum contacts include but are not limited to:

a.   Brown resides in New Hampshire which establishes the necessary minimum contacts with the United States;

b.   Organizing, recommending or selling investments with Utah individual and entity Defendants Ashby, Nelson, Bowser, Rutherford, Rockwell, Noah's, Rockwell Indianapolis, and Gabriel Construction properties that are the subject of this Complaint,

c.   Facilitating contractual agreements between Plaintiffs and Utah entities Rockwell Indianapolis and Cadence in furtherance of the acts that are the subject of this Complaint,

d.   Sending and receiving numerous emails to and from Utah Defendants Ashby, Nelson, Beynon, Rutherford, Rockwell, and Cadence, oftentimes with Plaintiffs as parties to the email exchange.

40.     E&W's minimum contacts are established through the conduct of its employees, Hamrick and Brown, while acting within the scope of their employment, including but not limited to organizing, recommending, or selling investments with Utah individual and entity Defendants, facilitating contractual agreements between Plaintiffs and entity Defendants, sending and receiving numerous emails to and from Utah Defendants, and receiving funds as commission for the sale of property owned by Rockwell Indianapolis.

41.     DeSalvo's minimum contacts include but are not limited to:

   a.  DeSalvo resides in Florida and therefore has the relevant minimum contacts with the United States;

   b.  Organizing, recommending, and promoting investments with Utah individual and entity Defendants Ashby, Nelson, Bowser, Beynon, Rutherford, Rockwell, Noah's, Rockwell Indianapolis, and Gabriel Construction that are the subject of this Complaint,

   c.  Facilitating contractual agreements between Plaintiffs and Utah entities Rockwell Indianapolis and Cadence in furtherance of the acts that are the subject of this Complaint,

   d.  Making trips to Utah in 2018 for business purposes that are the subject of this Complaint, to strategize and disseminate marketing and other plans, and to visit personally with Ashby, among others,

   e.  Causing false and misleading rental calculators to and from Utah related to the property that are the subject of this Complaint,

14

    f.   Sending and receiving numerous emails to and from Utah Defendants Ashby, Nelson, Beynon, Rutherford, and Rockwell, oftentimes with Plaintiffs as parties to the email exchange, and

    g.  Receiving funds as commission for the sale of property owned by Rockwell Indianapolis, a Utah entity.

42.    Belle Isle's minimum contacts are established through the conduct of its employee, DeSalvo, while acting within the scope of his employment, including but not limited to organizing, recommending, or selling investments with Utah individual and entity Defendants, facilitating contractual agreements between Plaintiffs and entity Defendants, sending and receiving numerous emails to and from Utah Defendants, and receiving funds as commission for the sale of property owned by Rockwell Indianapolis.

43.    Kirstin Parkin, an employee and agent of FATCO, resides in Utah and does business in the State of Utah on behalf of FATCO.

## VENUE

44.    Venue is proper before this court pursuant to 28 U.S.C. § 1391.

45.    Venue is proper in this judicial district pursuant to Section 2 of the Exchange Act, 17 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because a substantial part of the acts complained of occurred in this judicial district.

46.    In connection with the acts and omissions alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## PARTIES

### Plaintiffs

47.     Plaintiff Rosa DiTucci is an individual and resident of Massachusetts.

48.     Plaintiff Steven R. LaRoza is an individual and resident of New Hampshire.

49.     Plaintiff Debra A. LaRoza is an individual and resident of New Hampshire.

50.     Plaintiff Bruce I. Rose is an individual and resident of Florida.

51.     Plaintiff Maureen A. Rose is an individual and resident of Florida.

52.     Plaintiff Russell E. Hertrich Revocable Trust is a New Hampshire entity with its principal place of operation in New Hampshire.

53.     Plaintiff Russell E. Hertrich is an individual and resident of New Hampshire. Hertrich is a beneficiary of the Russell E. Hertrich Revocable Trust.

54.     Plaintiffs Sanford Roberts Revocable Trust and Helaine B. Roberts Revocable Trust are Maine entities with their principal place of operation in Maine.

55.     Plaintiff Sanford Roberts is an individual and resident of Maine. Sanford Roberts is a beneficiary of the Sanford Roberts Revocable Trust and the Helaine B. Roberts Revocable Trust.

56.     Plaintiff Helaine B. Sanford Roberts is an individual and resident of Maine. Helaine B. Roberts is the beneficiary of the Helaine B. Roberts Revocable Trust.

57.     Plaintiff, The Fred Jacob Living Trust, is a California entity with its principal place of operation in California.

58.     Plaintiff Fred Jacob is an individual and resident of California. Jacob is a beneficiary of The Fred Jacob Living Trust.

59.     Plaintiff Edward A. Hennessey 2001 Revocable Living Trust is a New Hampshire entity with its principal place of operation in New Hampshire.

60.     Plaintiff Edward A. Hennessey is an individual and resident of New Hampshire. Edward A. Hennessey is a beneficiary of the Edward A. Hennessey 2001 Revocable Living Trust.

61.     CAMAC, INC., is a Kansas corporation with its principal place of operation in Kansas.

62.     Plaintiff Blush Property, LLC ("Blush") is a Florida entity with its principal place of operation in Florida.

63.     Plaintiff Linda Camp is an individual and resident of Florida. Camp is a principal of Blush.

64.     Plaintiff Bryan Merklin is an individual and resident of Florida. Merklin is a principal of Blush.

**Defendants**

65.     Defendant Christopher J. Ashby is an individual and resident of Utah. Ashby is President and CEO of Rockwell.

66.     Defendant Jordan S. Nelson is an individual and resident of Utah. Nelson is Director of Operations of Rockwell.

67.     Defendant Scott W. Beynon is an individual and resident of Utah. Beynon was Executive Vice President of Real Estate of Rockwell.

68.     Defendant Scott Rutherford is an individual and resident of Utah.   Rutherford was Vice President of Marketing for Rockwell and received substantial commissions for the sale of TIC securities.

69.     Defendant Rockwell Debt Free Properties, Inc. is a Utah corporation with its principal place of business in Sandy, Salt Lake County, Utah.

70.     Defendant Rockwell TIC, Inc. is a Utah corporation with its principal place of business in Sandy, Salt Lake County, Utah.

71.     Defendant Rockwell Indianapolis, LLC is a Utah limited liability company with its principal place of business in Sandy, Salt Lake County, Utah.

72.     Defendant Noah Corporation is a Utah corporation with its principal place of business in Lehi, Utah County, Utah.

73.     Defendant Gabriel Management Corporation is a Utah corporation with its principal place of business in Lehi, Utah County, Utah.

74.     Defendant William "Bil" Bowser is an individual and resident of Utah.

75.     Defendant Edmund & Wheeler, Inc. is a New Hampshire corporation doing business in the State of Utah.

76.     Defendant John D. Hamrick is an individual and resident of New Hampshire.

77.     Kirsten Parkin is an individual and resident of Utah.

78.     First American Title Insurance Company is a California corporation doing business in Utah.

79.     The true names and capacities, whether corporate, associate, individual or otherwise, of defendants named herein as Does I-X, inclusive ("Doe(s)"), and Roe Corporations I-X ("Roe(s)"), inclusive, are presently unknown to Plaintiffs, and have therefore been sued under such fictitious names. Plaintiffs are informed and believe, and based thereon allege, that such Doe and Roe defendants, and each of them, were at all material times herein, residents and/or doing business in Utah and were in some manner responsible for the acts, omissions,

incidents, injuries, unauthorized takings, unjust enrichment, damages and other matters hereinafter alleged, and subject to liability therefore. Plaintiffs are informed and believe, and based thereon allege, that each defendant was the agent, servant, employee, employer, partner, principal, representative, affiliate and/or conduit of each of the remaining defendants and, at all times mentioned herein, was acting within the course and scope of such relationship and pursuant to said relationship, whether express, implied, ostensible or otherwise. Further, at all times relevant thereto and mentioned herein, each defendant did affirm, consent, confirm, direct, authorize, ratify, direct and/or instruct the acts and omissions of each and every one of the remaining defendants, as to each of the acts and omissions alleged herein. Plaintiffs will seek leave of court to amend this Complaint when the true names and capacities of such Doe and Roe defendants have been ascertained.

## FACTUAL BACKGROUND

80.     Plaintiffs are investors in an Indiana Tenant-in-Common investment, which purported to be an eligible 1031 Exchange, sponsored by Rockwell.

81.     This investment interest was bundled with a leaseback and management agreement.

82.     The investment was a passive interest in an enterprise operated and managed by Defendants.

83.     Specifically, the investment was in a common enterprise with profits to come solely from the efforts of others.

84.     A TIC investment allows up to 35 investors to hold title to real property, such as an office building, as common law "tenants in common" whereby each investor owns a physically undivided interest in the property.

85.     Each co-tenant's share in the property is expressed as a percentage interest of the whole.

86.     For example, twenty TIC investors can come together to purchase an entire office building whereby each investor owns 5% of the building. The twenty TIC investors thus own 100% of the building, but each investor's interest is 5% of the whole building, rather than an interest in any given defined space within the building.

87.     TIC investments are appealing to many investors because of their federal tax benefits.

88.     Section 1031 of the IRS Code allows individuals who have earned capital gains from the sale of real estate to legally defer paying federal taxes on those gains when they are re-invested in a similar property, subject to certain restrictions.

89.     TIC investments are therefore attractive to investors who wish to defer capital gains tax liability from a prior sale of real estate.

90.     TIC investments offer other benefits, too. TIC investors, for example, can earn a steady stream of income from base rents generated by the property during the term of the investment.

91.     TIC investments were aggressively marketed as completely passive, which many investors prefer because it relieves them of the responsibility of actively managing their investment property.

92.     The passive nature of the investment, potential tax benefits, and anticipated stream of steady income make TIC investments particularly attractive to older and retired investors such as many of the Plaintiffs.

93.     A TIC investor, however, must take care to ensure that their TIC investment is classified by the IRS as an investment in rental real property – what the IRS refers to as "an undivided fractional interest in rental real property" – rather than an interest in a business entity, such as a partnership. A TIC investment in real property is eligible for "tax-free exchange" under Section 1031(a)(1) of the Internal Revenue Code, *see* 26 U.S.C. § 1031(a)(1), whereas a TIC investment that the IRS concludes is an interest in a partnership will subject the TIC investor to the very federal taxes that the investor sought to defer by investing in a TIC.

94.     To guide TIC investors, the IRS issued Revenue Procedure 2002-22 ("Procedure 2002-22") in 2002. Procedure 2002-22 sets forth certain guidelines that the IRS uses to determine whether a TIC investment should be considered an interest in real property, where taxes are deferred, or an interest in a partnership, where taxes cannot be deferred. Procedure 2002-22 contains 15 different guidelines.

95.     One of those guidelines is the "No Business Activities" rule.

96.     In sum and substance, the TIC investment must be passive.

97.     The No Business Activities rule prohibits individual TIC investors from participating in the management of the property to ensure that the investment is passive.

98.     To comply with this rule, TIC investors usually hire a third party to manage the property rather than managing it themselves.

99.     A TIC investor who fails to follow IRS rules and guidelines for TIC investments can suffer significant adverse tax consequences, including liability for back taxes, interest, and penalties.

***Rockwell Sponsored and Apparently Sold Approximately 40 TIC Investments with Nearly Identical Structures***

100.    At all material times, Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, Bowser, and DeSalvo were close business associates.

101.    On information and belief, from approximately 2015, Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, Bowser, and DeSalvo conspired with one another to develop a scheme to fraudulently induce investors to purchase TIC investments at a grossly inflated price through marketing TIC interests in commercial properties located throughout the United States.

102.    The TIC interests were sold through packages of sales documents, financial calculators demonstrating return rates, and utilized finders such as Hamrick and Brown at E&W.

103.    Under the scheme, Ashby, Nelson, Rutherford, Hamrick, Brown, and DeSalvo made misleading representations and material omissions designed to create the appearance that the commercial properties were capable of generating sufficient revenue to service a $438,000 annual rent secured by Noah's, and provide a return on a $6,260,000 equity investment in the range of 7.00% to 10.20% over the course of twenty years.

104.    The Rockwell, Noah's and E&W Defendants all met at least annually, typically in Arizona, to develop strategy for maximizing the sales of Noah's TIC securities.

105.    These Defendants also met frequently in Utah for purposes of managing their conspiracy.

106.    LeFevre began his relationship with Rockwell as a real estate agent selling Rockwell TIC interests.

107.    Rockwell then hired LeFevre to investigate a relationship with an IRA business, which never transpired.

108.    LeFevre also taught real estate classes and realtors that Rockwell TICs should be included as part of their offerings.

109.    Approximately four years ago, Rockwell contracted with Sentinel Sales and Management ("Sentinel") as property administrator for most of its properties.

110.    After Rockwell's relationship with Sentinel deteriorated, Rockwell approached LeFevre and asked him to open a property administrator company.

111.    LeFevre Management, Inc., which then adopted the d/b/a Cadence, was incorporated on or about January 19, 2015.

112.    Sentinel kept Rockwell's existing customers and the new ones went to Lefevre thereafter.

113.    DeSalvo has sold TIC interests in approximately seven Rockwell properties over the years.

114.    DeSalvo earned approximately 3% in undisclosed commissions from each sale of TIC interests in Rockwell properties, including Noah's Carmel.

115.    However, based on their experience operating or working with Noah's over the previous several years with access to operational and financial performance information, Ashby, Nelson, Beynon, Hamrick, and Bowser knew or were reckless in not knowing that Noah's was not capable of generating sufficient revenue to service the rent, let alone provide a 7.00% to 10.20% on a $6,260,000 investment.

116.    Defendants recognized that potential investors gravitated to Noah's because of higher CAP rates, the purported stability of the investment, the liquidity of the asset and low risk.

117.    DeSalvo inquired to LeFevre, Ashby, and Bowser about whether there was a statement that he could make about the performance of Noah's to potential investors.

118.    Bowser spoke regularly with Ashby, Nelson, LeFevre, and Hamrick about the sale and the status of construction of the Rockwell properties.

119.    Bowser is quoted in sales material for Noah's Carmel.

120.    Defendants knew that these TIC interests were not readily liquid.

121.    Defendants also knew that Plaintiffs and other investors often treated these TIC interests as long-term investments, and approximately 3% of investors divested.

122.    Defendants communicated regularly with investors after closing, and approximately 50% of investors own TIC interests in two or more Rockwell properties.

123.    In addition, Defendants knew, or were reckless in not knowing, that the "rent" paid to one investor was frequently funded through funds received from investors in other TIC interests.  Armed with this knowledge, these Defendants systematically and deliberately made material misrepresentations and omitted material facts in an effort to sell Plaintiffs a vacant piece of land that was only worth a fraction of what they paid for it.  The vast majority of Hamrick's income was generated from commissions earned through the sale of Noah's TIC securities, and Hamrick knew these securities did not qualify for 1031 treatment.  Hamrick also lied to Plaintiffs about the commissions he earned.

124.    To effectuate this scheme, Ashby, Nelson, Rutherford, Hamrick, Brown, Bowser, and LeFevre developed an offering of up to $6,260,000 in TIC Interests, which was advertised as "debt-free." Ashby, Nelson, Rutherford, Hamrick, Brown, Bowser, DeSalvo, Parkin and their respective entities, Rockwell, E&W, Noah's, Gabriel Management, FATCO and Cadence, each played a significant role and substantially participated in the drafting, preparation and execution of the sale of Noah's Carmel.

125.     According to the Sales Package, the minimum purchase was a $150,000 undivided tenant in common interest in Noah's Carmel.

126.     Defendants Rockwell, E&W, and Belle Isle advertised the property with no closing costs and did not disclose any commissions or fees other than $700 in the Final Settlement Statement provided by escrow agent and title insurance underwriter Kirsten Parkin ("Parkin") at First American Title Company ("FATCO").

127.     The sales materials, although not identical, included similar language related to investor returns in the form of "rent." The materials represented, falsely, that the return was solely dependent on the performance of the specific event venue in which Plaintiffs would invest. The Rockwell materials further represented that other event venues have demonstrated an ability to generate revenue with "less than 6% of their current sales as a receivable." In addition, the offering package stated that "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels." These statements were false and were made by Defendants who knew or were reckless in not knowing that they were false. Only by "stealing from Peter to pay Paul" were Defendants able to conceal the poor performance of the event centers, including Noah's Carmel.

128.     Ashby, Nelson, Rutherford, Hamrick, Brown, Bowser, and DeSalvo communicated with investors on multiple occasions. In these communications, Defendants reinforced the misrepresentations contained in the sales materials and/or made by Defendants in pitching the sale of the TIC securities. When these representations were made, Defendants knew or were reckless in not knowing that they were false. In particular, Defendants knew or were reckless in not knowing that profits or rent paid to investors did not come from the profits or escrowed funds relating to the event facility in which the investment was made, but instead came

from other sources.  In addition, Defendants concealed from Plaintiffs that amounts between $600,000 to $1,000,000 of the funds invested by Plaintiffs were skimmed off the top as "commissions," and the bulk of the remaining funds were diverted to Noah's operations and Bowser's personal use.

129.    Rockwell sponsored at least 40 TIC investments in commercial properties located throughout the United States.

130.    All of the Rockwell TIC investment vehicles were essentially identical, as each relied upon a common investment structure and "cookie cutter" agreements that provided for the allocation of identical rights and responsibilities among the sponsor, the TIC investors, the property administrator companies, and others.

131.    Rockwell originated each TIC investment by:

    a.   Forming a wholly owned subsidiary of Rockwell as a Utah limited liability company to acquire the property underlying the TIC investment – Rockwell Indianapolis in this case;

    b.   Negotiating a purchase price for a suitable piece of commercial real estate;

    c.   Having Parkin at FATCO serve as Closing and Escrow agent for the underlying land and all of the TIC purchases, underwrite the title insurance policy, complete all of the deed recording tasks, and serve as a contact to TIC investors after purchase of the TIC interests;

    d.   Leasing each of the properties from the TIC investor owners to Noah's, Fresenius, or KinderCare – Noah's in this case; and

    e.   Causing the wholly owned subsidiary of Rockwell and subsequently the TIC investors to enter into property administrator agreements with Cadence or

Sentinel to manage the collection and disbursement of rents to TIC owners – Cadence in this case.

132.    In some instances, including Noah's Carmel, Rockwell sold TIC investments in vacant land on which a building was to be built. Rockwell described these transactions as "Construction TIC Transactions."

133.    In Rockwell's Construction TIC Transactions, the capital to construct the building was collected from Plaintiffs and the other investors rather than obtaining a mortgage or loan.

134.    Under the terms of the Purchase and Sale Agreement, the purchase funds were to be transferred to FATCO and applied toward the construction of improvements on Noah's Carmel on the basis of invoiced construction requisitions.

135.    Here, all of Plaintiffs' funds were disbursed to Bowser, Noah's, and Gabriel Construction shortly after closing.

136.    After the transaction closed, Rockwell made the first rent payment directly to each new owner.

137.    After the first rent payment, Cadence then distributed rents to Plaintiffs and provided monthly rent statements to TIC owners.

Rockwell continued paying the rent instead of Noah's until March 2019.None of the monthly rent statements disclosed that Bowser and others were misappropriating money from the TIC investments, that Defendants had taken commissions, that Rockwell was paying rent instead of Noah's, and that the rent was being recirculated to Plaintiffs directly from their own investment instead of from Noah's profits.

### *Requirements for 1031 Exchanges*

138.    Section 1031 of the Internal Revenue Code provides that no loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.  26 U.S.C. § 1031(a)(1).

139.    Because 1031 exchanges are exceptions to the general rule of capital gains, recognition the requirements for such transactions are complex, nuanced and strict.  FATCO advertises itself as an expert in 1031 exchanges and build-to-suit exchanges and promises to handle exchange funds with "care and trust."

140.    1031 exchanges must be the reciprocal transfer of property as distinguished from a transfer for money.  The transaction must involve the transfer of property by an exchanger (or "exchanger") and the receipt of property by the exchanger.  The transaction cannot be transfers of property for the receipt of money.  Typically, the parties to a 1031 exchange are: 1) the parties to the exchange, 2) an intermediary and 3) an escrow agent and title company.

141.    A "qualified intermediary" is a person or entity who enters into a written agreement with the taxpayer and as required by the exchange agreement "i) acquires the relinquished property from the taxpayer, ii) transfers the relinquished property, iii) acquires the replacement property, and iv) transfers the replacement property to the taxpayer."  26 C.F.R. § 1.1031(k)-1(g)(4)(iii)(B).

142.    Section 1031(a)(3) imposes three strict timing requirements.  First, the replacement property must be identified within 45 days from the date of the sale of the relinquished property.  Second, once the replacement property has been properly identified it must be acquired and the exchange completed no later than: i) 180 days after the sale of the

relinquished property; or b) the due date of the taxpayer's income tax return for the tax year in which the relinquished property was sold – whichever event occurs first.  26 C.F.R. § 1.1031(k)-1(b)(2)(ii).

143.    A taxpayer can only shield capital gains from the sale of the relinquished property to the extent of the value of the replacement property.  The purchase price of the replacement property must reflect "fair market value."

144.    In a build-to-suit exchange, all improvements to the property must be completed within the 180-day window.  Money from the relinquished property cannot be disbursed for purchase of the replacement property until the improvements are completed.

145.    Parkin and FATCO were aware of these requirements.  FATCO touts that its "Agent Advantage Team is experienced at closing complex commercial and residential transactions.  Our customer-focused experts manage every detail and use standardized processes to help agents of First American Title keep their closings on track."  FATCO also advertises its ability to provide "coordinated preparation of all title requirements and payoffs as well as coordination of other services including UCC insurance, 1031 tax-deferred exchanges . . ." https://www.firstam.com/title/commercial/commercial-escrow-settlement-services/

146.    FATCO claims to give its "customers the reliability they expect and the assurance of knowing their transactions are protected by the safeguards of First American Title." https://www.firstam.com/title/agency/escrow-production/

147.    Parkin and FATCO, in each transaction, were provided with the Purchase Agreement and other relevant sales documents detailing the 1031 exchange nature of the transaction and the particulars of the escrow and disbursement expected by the parties.  FATCO promises in its sales materials that "[o]ur escrow and settlement professionals work hand in hand

with title professionals to protect commercial property owners, lenders and principals.  Acting as a neutral third party, our escrow team closes your transaction based on the terms of your contract and its amendments – only after satisfying all the conditions of the contract."

https://www.firstam.com/title/commercial/commercial-escrow-settlement-services/

148.    In a manner contrary to FATCO's internal policies and procedures, inconsistent with the requirements of a valid 1031 build-to-suit exchange, inconsistent with the Purchase Agreement and contrary to American Land Title Association ("ALTA") policies, Parkin and FATCO immediately disbursed all Plaintiffs' invested funds the day of receipt.  Rather than safeguarding and protecting Plaintiffs' funds, Parkin and FATCO facilitated the misappropriation of those funds by Rockwell and other co-conspirators by disregarding all of the above requirements for proper disbursement of funds.  Parkin and FATCO knew that immediate disbursement of investment funds to the Defendants before any construction had occurred on the subject property was inconsistent with FATCO's obligations and with the relevant 1031 regulations.  Parkin and FATCO knew that the funds were immediately distributed because Noah was insolvent and could not meet its current obligations without using new investor funds to pay its outstanding bills.  Parkin and FATCO, for example, withheld deeds and did not record them timely at the instruction of Rockwell to assist in the illusion that the Noah securities investments were 1031 compliant.

### Purchase and Sale of Noah's Carmel

149.    On or about May 10, 2018, Rockwell organized Rockwell Indianapolis, LLC in the State of Utah.

150.    On or about June 27, 2018, Rockwell Indianapolis purchased Noah's Carmel for $654,750.

151.   The Indiana Sales Disclosure Form indicates that Noah's Carmel was conveyed to Rockwell Indianapolis on June 27, 2018 with Parkin of FATCO acting as closing and escrow agent.

152.   Before June 27, 2018 and prior to Rockwell having legal ownership of Noah's Carmel, Rockwell Indianapolis had already sold TIC interests in the property to Plaintiffs Edward A. Hennessey 2001 Revocable Living Trust on June 19, 2018; CAMAC on June 25, 2018; and the Russell E. Hertrich Revocable Trust on June 22, 2018 for a total of over $2,219,000. Parkin of FATCO acted as closing and escrow agent.

153.   The Indiana Sales Disclosure Forms for Plaintiffs Edward A. Hennessey 2001 Revocable Living Trust, CAMAC, and the Russell E. Hertrich Revocable Trust represent falsely that the property interests were not conveyed until July 2, 2018; August 21, 2018; and February 15, 2019, respectively.

154.   Parkin and FATCO closed and acted as escrow agent on at least three Plaintiff purchases of TIC interests in the Carmel Property when Parkin and FATCO knew that Rockwell had not yet purchased the Property and did not hold legal title.

155.   FATCO's published website information as to 1031 exchanges notes that "any work done to the property after the investor takes title is not considered like-kind property and will not increase the value of the property for exchange purposes."  Parkin and FATCO knew at the time of closing that the Replacement Property was worth far less than the value of the Relinquished Property and thus would not shield the investment for purposes of IRS regulations. Indeed, where the Property was not owned by Rockwell at the time of the transaction Parkin and FATCO knew the Replacement Property did not exist and was therefore worthless.

156.    The Plaintiffs would not have purchased the Rockwell TIC interests if they had known that the Property had not even been purchased by Rockwell and was vacant land.

157.    On the closing date of the Rockwell purchases of the Property, Parkin and FATCO had already closed Plaintiff purchases of the TIC interests in the Property amounting to $2,219,000.  When Parkin and FATCO closed these transactions and while acting as escrow agent, Parkin and FATCO disbursed all of the invested funds to Rockwell while knowing that Rockwell did not own the subject Property.

158.    Noah's Carmel was most recently valued at $294,000 on January 1, 2018 by Hamilton County, Indiana Assessor.

159.    Prior to conveying each respective interest to Plaintiffs, Rockwell Indianapolis entered into a lease with Noah's ("Lease").

160.    According to the Lease, Noah's was to begin paying rent on June 13, 2018.

161.    Plaintiffs purchased their respective interests in Noah's Carmel, which, according to each deed and Defendants' marketing material, Plaintiffs believed was subject to the Noah's Lease.

162.    Plaintiffs' deeds, however, state that each property interest is subject to a lease between Rockwell Indianapolis (Landlord) and NOAH'S OPERATIONS CARMEL, LLC a Utah limited liability company (Tenant), dated June 13, 2018.

163.    Upon a search of Utah's Division of Corporations, NOAH OPERATIONS CARMEL, LLC does not exist.

32



*Statements in Rockwell's Sales Package*

164.    Rockwell prepared a sales package for Noah's Carmel that included an Executive Summary, a Property Description, and a Lease Profile ("Sales Package").

165.    An exemplar Sales Package for Noah's Carmel is attached hereto as Exhibit A.

166.    All Plaintiffs received and reviewed the Sales Package.

167.    The TIC securities were sold through offering materials substantially created by Ashby, Nelson, and Rockwell.

168.    The Sales Package advertised Noah's Carmel to investors for a purchase price of $6,260,000.

169.    The Sales Package included the following statements:

a.  The "Tenant in Common (TIC) interests offered and sold by Rockwell Debt-Free Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchasers of TIC interests will not be entitled to the protections afforded to purchasers of securities under federal

and state securities laws. Nothing in the attached offering documents should be
construed as an offer or a solicitation of an offer to buy or sell securities" (the
"Securities Statement").

b.   Noah's Carmel "satisfies IRS requirements for 1031 exchanges."

c.   "Noah's pays directly all of the taxes, insurance premiums and all of the
maintenance costs of the building. Therefore, the property co-owners have no
active management duties, rendering this triple-net lease property a hassle-free,
real estate investment."

d.   "Noah's booking fees are approximately 25% less than its competition and each
location hosts an average of 30,000 plus visitors at over 300 events annually."

e.   Noah's business and operations were "recession-resistant."

170.   The Executive Summary of the Sales Package included a Risk Analysis section.

171.   The Risk Analysis section stated that "Noah's anticipates revenues to well exceed
the debt service and operating cost with their breakeven well below their currently operating
occupancy levels."

172.   The Sales Package described the Lease as $438,000 for 2019 with 2.0% annual
increases. The Lease description also included an average "Cap Rate" of 8.5% over the initial
lease term of 20 years.

| AVERAGE RETURN: Initial Term: 8.50% | | |
|---|---|---|
| YEAR | ANNUAL RENT | CAP RATE |
| CONSTRUCTION PERIOD | $438,000 | 7.00% |
| APRIL 2019 | $438,000 | 7.00% |
| APRIL 2020 | $446,760 | 7.14% |
| APRIL 2021 | $455,695 | 7.28% |
| APRIL 2022 | $464,809 | 7.43% |
| APRIL 2023 | $474,105 | 7.58% |
| APRIL 2024 | $483,587 | 7.73% |
| APRIL 2025 | $493,259 | 7.88% |
| APRIL 2026 | $503,124 | 8.04% |
| APRIL 2027 | $513,187 | 8.20% |
| APRIL 2028 | $523,451 | 8.37% |
| APRIL 2029 | $533,920 | 8.53% |
| APRIL 2030 | $544,598 | 8.70% |
| APRIL 2031 | $555,490 | 8.88% |
| APRIL 2032 | $566,600 | 9.06% |
| APRIL 2033 | $577,932 | 9.24% |
| APRIL 2034 | $589,490 | 9.42% |
| APRIL 2035 | $601,280 | 9.61% |
| APRIL 2036 | $613,306 | 9.80% |
| APRIL 2037 | $625,572 | 10.00% |
| APRIL 2038 | $638,083 | 10.20% |

173.    When these representations were made, Rockwell and Noah's knew or were reckless in not knowing that they were false.  Defendants Hamrick, Brown, and E&W at the time they recommended investment in the Carmel securities knew, or in the exercise of reasonable care should have known, that the representations were false.  In addition, Hamrick and/or Brown represented to one or more of the Plaintiffs that for many years Noah's had not missed a rent or tax payment.  Defendants also knew that there was no reasonable basis upon which to offer returns of roughly 8.5% on the TIC securities, in part, because Defendants' ability to pay "rent" on other event center securities was contingent upon cash from other properties or infusions of money from new investors.

174.    The Lease profile lists a "Construction Period" prior to April 2019, but nowhere in the Sales Package is a "Construction Period" described.

175.    Construction costs were not in the Sales Package.

176.    The bottom of most pages of the Sales Package included a URL mynoahs.com, which is an inactive website.

177.    The Sales Package included 13 photographs of the interior and seven photographs of the exterior of an existing building.

178.    The photographs in the Sales Package were misleading in that the building appeared to be completed or near completion.

 

179.    As late as November 8, 2018, Defendants had not yet received site plan and design approval from the City of Carmel for the building.

180.    Plaintiffs each individually or on behalf of an entity executed a purchase and sale agreement ("Purchase and Sale Agreement"), a Tenancy in Common Agreement, and a standard form management agreement ("Property Administrator Agreement") (collectively, "Contracts").

### *Sale to DiTucci*

181.    In January 2018, DiTucci contacted Hamrick looking for a no-debt investment that she could keep for two years and liquidate after the two-year period.

182.    Hamrick made the following representations to DiTucci:

   a.   Rockwell would meet her needs;

   b.   Rockwell had corporate tenants, Noah's and Fresenius, and triple-net leases, in which the tenant paid all expenses;

   c.   TICs are eligible for 1031 Exchanges;

   d.   Hamrick was an owner of Noah's;

   e.   Investing in Noah's was the best thing that he had ever done;

   f.   Noah's had low overhead, had a high profit-margin, was growing, and had never missed a rent payment in the time he had been involved with them;

   g.   A recent court case that qualified TICs as 1031 Exchange vehicles;

   h.   The true value of the properties offered by Rockwell is in the lease with the tenant and the cap rates; and

   i.   TICs are not securities.

183.    On January 19, 2018, Hamrick sent DiTucci a marketing package and a rent calculator on Noah's' Overland Park, KS properties.

184.    On February 1, 2018, Ashby made the following representations to DiTucci:

   a.   Rockwell has a construction partner and a construction arm;

   b.   Rockwell oversees the construction of the buildings;

   c.   Rockwell disburses funds to the contractor during construction based on work orders;

   d.   Standard commissions included the construction carrying costs;

e. Rockwell serves as the facilitator to and partners with Noah's and other tenants in that Rockwell and the tenants work together to obtain investors and erect the buildings;

f. Rockwell has an ownership interest in many of the properties that it sells;

g. The relationship is between the property management company, the investor, and the tenant after the tenant moves in;

h. A recent court case that qualified TICs as 1031 Exchange vehicles;

i. The true value of the properties offered by Rockwell is in the lease with the tenant and the cap rates; and

j. TICs are not securities.

185.    On March 14, 2018, DiTucci purchased a TIC interest in a Rockwell property leased by Fresenius.

186.    In June 2018, DiTucci contacted Hamrick again searching for another investment property. Hamrick then made the following representations to DiTucci:

a. Noah's Carmel was sold out;

b. The Noah's Carmel building was under construction and would be completed by the first of the year 2019;

c. Noah's was growing 25% year over year;

d. Noah's was the largest event venue in the country, which is echoed on Noah's website; and

e. Noah's had 27 Rockwell sites, and many of them were completely booked for weddings and corporate venues.

187.    In August and September 2018, DiTucci spoke with Ashby and Nelson on several occasions about Noah's Carmel. Ashby and Nelson made the following representations to DiTucci:

      a.   Noah's was stable, an excellent tenant, paid the rent on time, and was growing; and

      b.   Noah's paid the property taxes and insurance on a triple-net lease.

188.    DiTucci asked Ashby and Nelson for financials to verify their claims about Noah's.

189.    Ashby and Nelson told DiTucci that Noah's was a privately-held company, so it was not possible to get financials.

190.    Hamrick, Ashby, and Nelson told DiTucci that Bowser was trustworthy and a family man.

191.    Ashby and Nelson told DiTucci that they and Rockwell had a very close relationship with Bowser and Noah's.

192.    Ashby and Nelson did not tell DiTucci that Noah's and Gabriel Construction were the construction contractor for Noah's Carmel.

193.    Ashby and Nelson told DiTucci that owners of Rockwell properties must offer their TIC interests to existing TIC owners first before attempting to sell their TIC interests to third parties.

194.    Prior to closing, a Rockwell employee told DiTucci that building permits had been submitted to the City of Carmel, and construction on Noah's Carmel was scheduled to begin as soon as the City of Carmel approved the permits.

195.    On September 14, 2018, DiTucci closed on Noah's Carmel.

196.    At closing, all of DiTucci's investment was immediately disbursed to Rockwell. Parkin and FATCO knew immediate disbursal was improper and contrary to the Purchase Agreement as no construction had begun on the Carmel Property.

197.    Parkin and FATCO withheld the statutorily mandated Indiana Sales Disclosure Form as required by law and by FATCO's own policies and procedures.

198.    Parkin and FATCO failed to record the deed within two days as required by FATCO's policies and procedures and by ALTA standards for the title industry.

199.    DiTucci's deed was not recorded until March 26, 2019 by Parkin and FATCO. An employee of FATCO, Felicia Saez ("Saez"), told DiTucci, falsely, that the deed "had been lost in the mail."

200.     About a week after closing, DiTucci received an Indiana Sales Disclosure Form from Rockwell stating that it had been omitted by accident from the closing documents.

201.    Cadence paid rent in the amount of $4,509.25 to DiTucci each month beginning in October 2018, including March 2019.

202.    In January 2019, DiTucci discovered from Nelson that construction on Noah's Carmel had still not yet begun.

203.    A Rockwell employee told DiTucci that Bowser had already booked weddings at Noah's Carmel, so construction would be completed before the fall of 2019.

204.    In February 2019, DiTucci called Rockwell again and asked why permits had still not been issued.

205.    Beynon told DiTucci that the walls of the building were already built and that permits had been slowed down.

206.    Beynon assured DiTucci that Noah's was constructing the building, and it would be completed before the fall.

207.    DiTucci then asked Beynon to transfer her ownership to a property leased by Fresenius.

208.    Beynon told DiTucci that he could not transfer her ownership to a property leased by Fresenius, but that he could transfer her ownership interest to another Noah's property with a fully constructed building.

209.    At this time, Benyon and Rockwell knew that Noah's was delinquent on rent and taxes on other Rockwell-sponsored properties.

210.    On or about March 6, 2019, LeFevre informed the other property owners that Noah's was delinquent on rent and taxes.

211.    After about March 6, 2019, Ashby told DiTucci that Rockwell had already disbursed all of the funds to Noah's and that those funds were disbursed according to Noah's construction requisitions.

212.    Ashby then told DiTucci that Noah's had a separate construction entity, Gabriel Construction, and the money should be held in a separate account by that company.

213.    On or about March 13, 2019, Ashby told DiTucci that Rockwell paid rents until Noah's completed construction of the building, at which point Noah's would take over paying the rents.

214.    Ashby told DiTucci that Rockwell was no longer going to pay rents in accordance with the construction schedule referenced in the Sales Package, which indicated that the building was supposed to be completed by April 2019.

215.    Plaintiffs were not told that Rockwell paid the rents.

216. Ashby also told DiTucci that the walls of the building were already built offsite and that Noah's paid over a million dollars for the land.

217. Ashby told DiTucci that Noah's submitted requisitions for construction of Noah's Carmel to Rockwell, and that Rockwell had already disbursed the entire construction budget to Noah's for the Noah's Carmel building based on those requisitions.

218. Disbursement schedules, however, show that Rockwell had disbursed the entirety of the funds, $6.26 million, to Noah's for the Noah's Carmel building prior to the LaRozas' and DiTucci's closing on the property in September 2018, and months before any building permits were received from the City of Carmel.

219. On information and belief, building permits have still not been issued from the City of Carmel.

220. On or about March 13, 2019, Hamrick and Ashby told DiTucci that Noah's paid over $1 million for the Noah's Carmel land and that the building walls were already built and waiting at the factory.

### Sale to the LaRozas

221. Mr. and Mrs. LaRoza (collectively, the "LaRozas) met Hamrick in November 2014.

222. Hamrick represented to the LaRozas that TIC properties were a good investment because the LaRozas would not have to deal with tenants, pay property tax, pay insurance, or handle maintenance.

223. Hamrick represented that each of these obligations was handled by the property management company.

224. Hamrick made the following representations to the LaRozas:

a.   Investors wishing to invest in Rockwell TICs must have no debt on their property used to fund for the 1031 exchange; and

b.   Noah's was financially stable, a leader in the event venue industry, and had a projected growth plan.

225.   In addition to Rockwell properties leased by Noah's, Hamrick offered TIC investments in properties leased by Fresenius and KinderCare to the LaRozas.

226.   The Noah's properties offered to the LaRozas by Hamrick had larger returns, better rent, better leases, and better lease extensions than the properties leased by Fresenius and KinderCare.

227.   The LaRozas met with Hamrick several times at E&W's office in Franconia, New Hampshire over the years and eventually invested in five Rockwell Noah's properties, including Noah's Carmel.

228.   Hamrick did not tell the LaRozas that construction of the Noah's Carmel building was behind schedule.

229.   In July 2018, Hamrick told the LaRozas that the Noah's Carmel building was just being finished.

230.   On September 10, 2018, the LaRozas purchased a 4.64% TIC interest in Noah's Carmel.

231.   On January 10, 2019, the LaRozas invested another $88,875.00 in Noah's Carmel, increasing their TIC interest to 6.06%.

232.   The LaRozas invested in Noah's Carmel because

a.   The amount they would receive monthly for the term of the lease was high;

b.   The return on investment was high; and

c.   They did not have to obtain insurance, pay property taxes, or provide

maintenance for the property.

233.    At no time did Hamrick tell the LaRozas that the building was not complete, nor

that the lot was vacant.  Parkin and FATCO knew that no construction had been completed on

the Property and nevertheless immediately disbursed all funds to Rockwell in a manner

inconsistent with 1031 requirements and the Purchase Agreement.

234.    Hamrick told the LaRozas that there were no commission fees and that E&W

charged a flat fee of $700, which was accounted for on the closing documents.

235.    The LaRozas' deed was not recorded until March 29, 2019 by Parkin and

FATCO. Saez at FATCO told Steve LaRoza that FATCO normally receives the deeds a couple

of weeks after the purchase closes. Saez told Steve LaRoza that when FATCO received the

LaRozas' deeds, the deeds were erroneously filed instead of immediately recorded.

236.    Failure to record the deeds within two days after closing violates FATCO's

internal policies and procedures and industry standards as promulgated by ALTA.

237.    Parkin and FATCO knew that no construction had occurred on the Property and

that completion of construction within 180 days as required by 1031 regulations was impossible.

Nevertheless, Parkin and FATCO immediately disbursed all funds to Rockwell in a manner

inconsistent with 1031 requirements and the Purchase Agreement.

### *Sale to Edward A. Hennessey 2001 Revocable Living Trust*

238.    On or about June 1, 2018, Hennessey met with Hamrick at E&W's office in

Franconia, New Hampshire.

239.    Hamrick made the following representations to Hennessey:

    a.   Noah's Carmel was under construction with a planned opening in early spring of 2019;

    b.   Hamrick had made several investments in Noah's over the years;

    c.   All of the investments had worked out great; and

    d.   Hamrick planned to make additional investments with Noah's in the future.

240.   On June 19, 2018, Hennessey purchased a 6.39% TIC interest in Noah's Carmel for $400,000 on behalf of the Edward A. Hennessey 2001 Revocable Living Trust.

241.   Hennessey received a letter dated June 26, 2018 signed by Ashby that indicated the first rent payment had been sent.

242.   Beginning in July 2018, Cadence paid $2,792.43 per month in rent to the Edward A. Hennessey 2001 Revocable Living Trust.

243.   On August 17, 2018, months after closing, Rockwell asked Hennessey to sign an Indiana Sales Disclosure Form that indicated a checkbox for vacant land.  Parkin and FATCO intentionally withheld the Sales Disclosure Form at the time of closing.

244.   Hennessey was puzzled that the sales disclosure form indicated vacant land, but he was not alarmed because three months of rent payments had already been received.

245.   Parkin and FATCO immediately disbursed all invested funds to Rockwell at closing notwithstanding Parkin and FATCO's knowledge that on the date of closing Rockwell did not own the Property purportedly sold to Hennessey.  This disbursal was inconsistent with Parkin and FATCO's fiduciary duties as closing and escrow agents for the transaction.

### *Sale to Sanford Roberts Revocable Trust and Helaine Roberts Revocable Trust*

246.   On April 25, 2018, Brown of E&W sent information regarding Rockwell and Noah's to the Roberts.

247.    On July 18, 2018, Brown made the following representations to Sanford Roberts:

    a.   Noah's Carmel was under construction;

    b.   A lease with Noah's was in place;

    c.   One of the benefits of investing with Rockwell and having Cadence manage the properties was that TIC interests could easily be sold to existing investors, making Rockwell's TIC investments more liquid than a traditional property interest;

    d.   The lease is on the land now incorporating the building once complete;

    e.   Noah's had already booked events at Noah's Carmel; and

    f.   Noah's was making lease payments during construction.

248.    On July 19, 2018, Brown sent the Sales Package to the Roberts.

249.    On or about July 27, 2018, the Roberts purchased a 3.57% TIC interest in Noah's Carmel for $223,216 on behalf of the Sanford Roberts Revocable Trust and Helaine Roberts Revocable Trust.

250.    The Sales Disclosure Form filed with Indiana did not disclose the percentage of ownership sold to the Roberts Trust.

251.    Parkin and FATCO knew that no construction had occurred on the Property and that completion of construction within 180 days as required by 1031 regulations was impossible. Nevertheless, Parkin and FATCO immediately disbursed all funds to Rockwell in a manner inconsistent with 1031 requirements and the Purchase Agreement.

### *Sale to The Fred Jacob Living Trust*

252.    Nelson told Jacob that Noah's Carmel was under construction and would be completed in early 2019.

253.    On or about July 10, 2018, Jacob, on behalf of the Jacob Trust, purchased a 3.29% TIC interest in Noah's Carmel for $206,000 on behalf of The Fred Jacob Living Trust.

254.    On July 25, 2018, Cadence sent Jacob an email sharing the Noah's Carmel closing package and executed Contracts with Jacob.

255.    Parkin and FATCO knew that no construction had occurred on the Property and that completion of construction within 180 days as required by 1031 regulations was impossible. Nevertheless, Parkin and FATCO immediately disbursed all funds to Rockwell in a manner inconsistent with the Purchase Agreement.

### Sale to Russell E. Hertrich Revocable Trust

256.    Hamrick met with Hertrich approximately three times at the offices of E&W Franconia, NH, where Hamrick taught Hertrich about 1031 Exchanges.

257.    Hamrick told Hertrich that he had invested in one or more of the Noah's' properties.

258.    Hamrick served as both salesperson and QI for Hertrich.

259.    On or about June 22, 2018, Hertrich purchased a 23.15% TIC interest in Noah's Carmel for $1,449,475.41 on behalf of the Russell E. Hertrich Revocable Trust.

260.    On June 26, 2018, before Rockwell had purchased the land, Ashby sent a "welcome package" to Hertrich, which included:

   a.   A Settlement Statement showing an escrow disbursement date of June 25, 2018;

   b.   A Sales Disclosure Form showing a conveyance date of June 25, 2018; and

   c.   A Request and Authorization for Release of Escrow Funds on E&W letterhead authorizing E&W to disburse funds to FATCO signed by Hamrick and Timothy L. Burger on June 22, 2018.

261.    In June 2018, Hertrich began receiving rents from Cadence in the amount of $8,414.75 per month.

262.    Hertrich's deed was not recorded by Parkin and FATCO until February 13, 2019.

263.    Hertrich received a letter from Parkin and FATCO dated February 21, 2019. The letter references a property in Hamilton County, NC.

264.    The Limited Warranty Deed enclosed with the letter shows that Ashby executed the Limited Warranty Deed on behalf of Rockwell Indianapolis on July 2, 2018 with Nelson as Notary Public.

265.    The Sales Disclosure Form enclosed with the letter was signed by Ashby on August 29, 2018 and shows a false hand-written conveyance date of July 2, 2018.

266.    Parkin and FATCO immediately disbursed all invested funds to Rockwell at closing on June 22, 2018 notwithstanding Parkin and FATCO's knowledge that on the date of closing Rockwell did not own the Property purportedly sold to Hennessey.  This disbursal was inconsistent with Parkin and FATCO's fiduciary duties as closing and escrow agents for the transaction.

### *Sale to Bruce I. and Maureen A. Rose*

267.    In May 2016, the Roses were introduced to Rockwell and exchanged multiple emails and some phone calls with Rutherford, a Rockwell employee.

268.    Rutherford made the following representations to the Roses:

 a.   Investments in Rockwell properties provided a dependable, steady income based on rents made by established growing companies, including Noah's;

 b.   Rockwell's TIC opportunities were different because Rockwell's properties did not have a mortgage;

c.   Almost all possible problems would be managed by and paid for by the renting company, Noah's;

d.   The TIC investment was analogous to an annuity with the benefit that the initial principal would be returned to the Roses' estate by sale of the property, given that the 20-year lease should last until the end of their lives;

e.   The Roses or their estate could sell the property to existing investors at a markup based on the current rent at the time the property was sold;

f.   Existing investors would purchase the property because they had experience with the building and the rents received;

g.   If the existing building owners did not purchase the property, Rockwell would offer the property to other prior Rockwell buyers, but that this had not happened to date; and

h.   When Bruce Rose asked for a list of other building owners in a property of interest, Rutherford told him that Rockwell could not supply this information until he purchased the property.

269.   In June 2018, the Roses decided to invest with Rockwell.

270.   Rutherford also sent the Sales Package to the Roses.

271.   When the Roses decided to invest with Rockwell, Rutherford told him that many locations that were of interest to him were sold out, so the Roses would have to wait until Rockwell had completed other properties. This statement led the Roses to believe that Rutherford meant that Rockwell had to finish building them.

272.    Rutherford told the Roses that Noah's Carmel was also sold out. Days later, however, Rutherford told the Roses that one investor decided to split his investment between properties, and there was an available investment for the amount that he wished to invest.

273.    Prior to the Roses' purchase, Rockwell Indianapolis still owned at least 62.77% of Noah's Carmel.

274.    After the Roses decided to invest in Noah's Carmel, the Roses began to work with Nelson over email and by phone.

275.    Neither Rutherford nor Nelson told the Roses that there was no building at Noah's Carmel.

276.    Based on Rockwell's Sales Package, the Roses believed that the pictures showed the interior of Noah's Carmel.

277.    Based on the Sales Package and the information Rutherford and Nelson had given them, the Roses believed that the building was completed or near completion.

278.    Prior to purchasing their TIC interest in Noah's Carmel, the Roses reviewed the Lease between Rockwell Indianapolis and Noah's. They believed that a building was already constructed on the property because the Lease was dated June 13, 2018.

279.    On or about July 17, 2018, the Roses purchased a 5.59% TIC interest in Noah's Carmel for $350,000.

280.    On or about July 19, 2018, the Roses received a "welcome package" from Ashby that contained the documents that Bruce Rose had signed online, a closing statement, a copy of the Lease, and a copy of the Purchase and Sale Agreement. This package also included the first rent payment of $870.47. The cover letter stated that all subsequent payments would be received from the property manager. At the end of the package was a list of the annual rents with 2%

increases each year. That listing of the rents also contained a picture that the Roses believed to be of the interior of the Noah's Carmel building.

281.    Approximately a month later, Nelson told the Roses that one more paper needed to be signed to get the deed from Indiana.

282.    Nelson told the Roses that Rockwell had just been told that this additional paper was needed, which the Roses presumed to be an idiosyncrasy of Indiana. Bruce Rose signed the paper and quickly sent it back.

283.    Bruce Rose signed the paper because he felt that the investment had already been made and that he needed to sign this paper in order to obtain a deed for it.

284.    The Roses received monthly rent payments of $2,005.35 from Cadence covering the period from August 1, 2018 to March 31, 2019.

285.    In March 2019, Bruce Rose was shocked to learn that there was no building on the Noah's Carmel property.

286.    Parkin and FATCO immediately disbursed all invested funds to Rockwell at closing notwithstanding Parkin and FATCO's knowledge that on the date of closing no construction had occurred on the Property and completion of construction within 180 days was impossible. This disbursal was inconsistent with Parkin and FATCO's fiduciary duties as closing and escrow agents for the transaction.

### *Sale to CAMAC, Inc.*

287.    On or about June 25, 2018, CAMAC, Inc. purchased a 13.36% TIC interest in Noah's Carmel for $836,142.

288.    At the time of sale, James M. Caplinger, Jr. purchased the TIC interest on behalf of CAMAC as President of CAMAC.

289.     Parkin and FATCO immediately disbursed all invested funds to Rockwell at closing notwithstanding Parkin and FATCO's knowledge, among other things, that on the date of closing Rockwell did not own the Property purportedly sold to CAMAC.  This disbursal was inconsistent with Parkin and FATCO's fiduciary duties as closing and escrow agents for the transaction.

### Sale to Blush Property, LLC

290.     In or around June 2018, Camp and Merklin, the principals of Blush Property, discovered Rockwell through a website called 1031 Placement, which is a division of Defendant Belle Isle.

291.     Defendant DeSalvo communicated directly with Camp, Merklin, and Blush Property regarding the offer and sale of Noah's Carmel.

292.     On or around June 21, 2018, DeSalvo sent Camp, Merklin, and Blush Property the Sales Package for Noah's Carmel.

293.     After reviewing the Sales Package and communicating with Nelson about Noah's and Noah's Carmel, Camp and Merklin researched Carmel, Indiana, including property values, crime rates, and population growth.

294.     On or about August 13, 2018, Blush Property purchased a 5.9% TIC interest in Noah's Carmel for $369,300.

295.     Nelson facilitated this purchase during this time period through email exchanges and sending closing documents to Camp and Merklin.

296.     Blush Property received $2,118.50 per month in rent from Cadence after purchase.

297.   Parkin and FATCO immediately disbursed all invested funds to Rockwell at closing notwithstanding Parkin and FATCO's knowledge that on the date of closing no construction had occurred on the Property and construction could not be completed within 180 days. This disbursal was inconsistent with Parkin and FATCO's fiduciary duties as closing and escrow agents for the transaction.

### *All Plaintiffs*

298.   In total, Plaintiffs invested approximately $4.9 million in principal to purchase Noah's Carmel.

299.   Plaintiffs represent approximately 78% ownership in Noah's Carmel.

300.   Ashby signed the deed on behalf of Rockwell Indianapolis for each transaction.

301.   Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, and DeSalvo are not registered or licensed as brokers or investment advisers.

302.   Parkin at FATCO was the escrow agent for each transaction, underwrote the title insurance policy, completed all of the deed recording tasks, and served as a contact to Plaintiffs after purchase.

303.   Each FATCO final settlement statement indicated that fees of only $700 were charged to Plaintiffs for each transaction, as follows:

   a.   $150 Closing-Escrow Fee to First American Title Insurance Company National Commercial Services;

   b.   $50 Recording Fees to First American Title Insurance Company National Commercial Services;

   c.   $150 Title endorsement fee to First American Title; and

   d.   $350 Property Administration setup fee to Cadence Property Administrators.

304.    The Hamilton County Recorder's Office charges $25 to record deeds and all other instruments.

305.    Rockwell made the first rent payment to Investors after each respective purchase, and Cadence made all rent payments thereafter.  According to LeFevre as represented to Plaintiffs, the money was disbursed from Rockwell to Cadence, who then distributed it as "rent" monthly to the Plaintiffs.

306.    Rockwell and Cadence both issued 1099's to all Plaintiffs and characterized the income as rent.

307.    From October 3, 2018 to February 27, 2019, the Plaintiffs received fourteen emails from LeFevre and Cadence indicating that existing TIC owners of Noah's' properties intended to sell their interests and offering those TIC interests for sale.

308.    The number of TIC interests for sale by existing owners caused alarm, as Plaintiffs had been told that Rockwell's investors in Noah's rarely wished to sell their interests.

309.    Beginning in April 2019, Noah's ceased making payments to Cadence, and Plaintiffs have not received rent payments for Noah's Carmel since then.

310.    In another Rockwell investment package, Rockwell represented that "If the property does not perform as promised during your first six months of ownership, we will buy it back!"



54

311.    It was therefore in Rockwell's best interest to pay the rents to investors for Noah's at least six months after each purchase.

***Purchase and Sale Agreement***

312.    Plaintiffs each entered into the Purchase and Sale Agreement with Rockwell Indianapolis, wherein each Plaintiff was the Buyer and Rockwell Indianapolis was the Seller.

313.     "[Construction TIC Transaction]" appeared at the top of each Purchase and Sale Agreement.

314.    Pursuant to Section 3.2, Rockwell Indianapolis "shall periodically provide statements to First American Title Company detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds."

315.    Pursuant to Section 4, Rockwell Indianapolis agreed "to pay for an endorsement to the standard coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price."

316.    Ashby signed the Purchase and Sale Agreement on behalf of Rockwell Indianapolis as its Manager.

***Tenancy in Common Agreement***

317.    Plaintiffs each entered into the Tenancy in Common Agreement ("TIC Agreement").

318.    The TIC Agreement represented that Rockwell Indianapolis' ownership interest was 100%. Rockwell Indianapolis' ownership interest was less than 100% after each Plaintiffs' purchases.

319.    Pursuant to Paragraph 6.4, "All leases must be bona fide leases for federal tax purposes. Rents paid by a lessee must reflect the fair market value for the Property."

320.   The Lease for the current period of $438,000 is not fair market value.

321.   Pursuant to Section 8.3, "An Owner may not sell, convey, or transfer the Owner's undivided interest in the Property, or seek a partition of the Owner's undivided interest in the Property, unless the Owner (the "Selling Owner") first offers to sell the Selling Owner's undivided interest to the other Owners."

322.   Pursuant to Paragraph 8.4, "The Selling Owner must, in writing, offer the Selling Owner's undivided interest in the Property to each of the other Owners. The means of communicating the offer to the other Owners shall be via written communication from the property manager by email or similar means."

323.   Rockwell Indianapolis never offered to sell any part of its interest to Plaintiffs prior to selling the interests to new owners.

324.   Pursuant to Paragraph 8.5, "The accepted interests of the Selling Owner in the Property must be purchased for the entire Property's fair market value multiplied by the Ownership Percentage being purchased."

325.   When Rockwell Indianapolis sold each of the interests to Plaintiffs, the respective interests were not purchased for the entire Property's fair market value multiplied by the Ownership Percentage being purchased.

326.   Pursuant to Paragraph 18, "Neither this Agreement, nor any right or interest herein, may be assigned by a party hereto."

### *Property Administrator Agreement*

327.   In their capacity as owners of the real estate, all Plaintiffs except Hertrich entered into the Property Administrator Agreement, wherein each Plaintiff was Co-owner and Cadence was the Property Administrator ("Property Administrator" or "PA").

328.    The Property Administrator Agreement served a critical function – it removed and insulated Plaintiffs from any and all management functions, thereby protecting the passive nature of the TIC investment for tax purposes. At the same time, this left Plaintiffs entirely dependent upon LeFevre and Cadence to duly carry out their performance and payment obligations under the Property Administrator Agreement and documents incorporated into the Property Administrator Agreement that are described below.

329.    The Property Administrator Agreement and Cadence's payment of rents helped perpetuate and conceal the fraud by concealing Bowser's and Noah's' unprofitability and inability to pay the rents as represented in the Sales Package. By paying rents timely to Plaintiffs, Plaintiffs either continued to believe that construction for the building was on schedule, the building was already constructed, Noah's was operating the event venue and realizing a profit, and/or Noah's was performing well enough to pay rent.

330.    Pursuant to Paragraph 6, "Property Administrator shall … act as Co-owners' agent."

331.    Pursuant to Paragraph 7a., Plaintiffs paid Cadence a fee of $35 per month.

332.    Pursuant to Paragraph 8, Cadence was obligated to, among other things:

a.    "[C]ollect monthly rent either directly from the tenant of the Property or from the property manager hired under separate agreement to manage the Property."

b.    "[P]rovide 1099 forms to the Co-Owners."

c.    "[B]e the representative of the Co-owners to the Tenant and/or the Tenant's property manager for all matters related to herein."

d.    "[N]otice and conduct any vote of the Co-owners required under the TIC Agreement."

e.  "[A]ssist any Co-owner desiring to sell its undivided interest in the Property by providing written notice of the offer to sell to the other Co-owners as required by section 8.3 and 8.4 of the TIC Agreement."

333.   Pursuant to Paragraph 14, "All co-owners will be listed on the Landlord policy as additional insureds. The PA will keep the Insurance Agent (Landlord's policy) updated regarding any changes in property ownership through the life of the lease."

334.   LeFevre signed the Property Administrator Agreement on behalf of Cadence as its Principal.

335.   Each Plaintiff provided Cadence a completed direct deposit form.

336.   Cadence deposited $36,500 collectively into Plaintiffs' accounts each month.

337.   Cadence knew that Plaintiffs were highly dependent on Cadence to safeguard their investments because as TIC investors, Plaintiffs were prohibited from actively managing Noah's Carmel or becoming involved in its affairs due to IRS rules governing TIC investments.

338.   Plaintiffs, as the actual owners of Noah's Carmel underlying the TIC investments, had the ultimate right to control Noah's Carmel's actions and decisions.

339.   The Property Administrator Agreement was not a property management agreement.

340.   LeFevre and Cadence did not manage day-to-day operations at Noah's Carmel.

341.   Plaintiffs were under the impression, however, that LeFevre and Cadence performed property management services for their property.

***Defendants Knew or Were Reckless in not Knowing That Funds Were Misappropriated***

342.   On or about March 13, 2019, the construction manager for Gabriel Construction, Brandon Jensen ("Jensen"), told DiTucci that the walls of Noah's Carmel were not built and that there was never a plan to complete construction of the building by the spring of 2019.

343.   Jensen told DiTucci that construction for the building was scheduled to begin in April 2019.

344.   On March 20 and 22, 2019, Bowser told DiTucci that Rockwell had given him a $6 million loan in 2017.

345.   Bowser also told DiTucci that Rockwell paid taxes on two of his buildings because Noah's could not meet the tax obligation.

346.   In August 2018, Bowser told Ashby and Nelson that he would not be building any more projects and that he was "under water" on several properties. Ashby and Nelson therefore knew that Noah's and the event centers were not profitable enough to make the rent payments as represented to Plaintiffs in the Sales Package.

347.   Ashby told Bowser not to change anything because it would ruin their business.

348.   On March 22, 2019, Bowser told Plaintiffs that he was "robbing Peter to pay Paul" and had used 85-90% of the funds from Noah's Carmel investors to perform work on other buildings, and the remaining 10% was used for operations.

349.   Bowser told Plaintiffs that Rockwell had full visibility and knew how he spent the funds. Ashby, Nelson, and others at Rockwell knew, for example, that funds invested by Plaintiffs were not spent on construction of Noah's Carmel. Bowser said that the construction requisitions were clear about where the funds were going.

350.     Bowser told Plaintiffs that Rockwell knew a year ago that the disbursements were not going to construct the building on Noah's Carmel.

351.     Funds wired to FATCO should have been disbursed to Rockwell Indianapolis to purchase and construct real property.

352.     Further, pursuant to the Purchase and Sale Agreement, Rockwell Indianapolis should have periodically provided statements to FATCO detailing the construction costs that it incurred. Rockwell Indianapolis then should have sought reimbursement of such costs via transfers of 1031 Funds.

353.     Instead, funds far exceeding the purchase price and construction costs of Noah's Carmel were disbursed to Defendants and were not used for construction.

354.     Ashby, Nelson, Hamrick, and Bowser perpetrated the misappropriation by diverting funds that should have been used to pay construction costs, funds that should have been used to pay base rents to Plaintiffs, funds that should have been used to pay operating expenses for Noah's Carmel, and funds that should have been used to pay taxes.

355.     The building remains unbuilt, and the land is currently vacant.

356.     Plaintiffs were unaware they were being defrauded. Plaintiffs exercised due care and diligence in seeking to discover the facts that form the basis for this Complaint but were thwarted by Defendants' fraudulent conduct and omissions. Defendants, through a series of affirmative acts and/or omissions described herein, suppressed the dissemination of truthful information regarding their illegal conduct and actively prevented Plaintiffs from learning of their illegal and/or tortious acts. Defendants' conduct was, by its nature, self-concealing and carried out in a manner that precluded detection.

357.    Ashby, Nelson, Rutherford, Hamrick, Brown, DeSalvo, Parkin and FATCO knew or should have known that 1031 Exchange funds must be used to purchase real property at fair market value in order to comply with the IRS Code.

358.    Ashby, Nelson, Beynon, Rutherford, Hamrick, and Brown knew that TIC investors were purchasing interests in Noah's Carmel for amounts that far exceeded the fair market value of the property.

359.    Ashby, Nelson, Beynon, Rutherford, Hamrick, and Brown knew or were reckless in not knowing that funds from TIC investors would be used for things other than the event center or its operations.

360.    Ashby knew that substantial commissions were taken from the invested amounts and concealed from investors.

361.    Ashby knew that Noah's was experiencing financial difficulties and that there was no reasonable basis upon which to project the returns he offered in Rockwell's sales documents.

362.    Under the Property Administrator Agreement, LeFevre and Cadence were responsible for collecting rents from Noah's Carmel and disbursing rents to Plaintiffs. Cadence specifically undertook to perform those duties including payment of the rents due to the TIC investors.

363.    In addition to an administrative role, Cadence listed Rockwell TIC properties for sale and facilitated the transfer and sale of TIC interests in several properties leased by Noah's, including Noah's Carmel.

364.    Under the Property Administrator Agreement, LeFevre and Cadence were responsible for assisting co-owners desiring to sell their TIC interests.

365.    Noah's Carmel is vacant and has no building under construction, yet LeFevre and Cadence paid rents to Noah's Carmel TIC owners.

366.    Despite knowing or being reckless in not knowing that Bowser and Noah's had misappropriated funds, LeFevre and Cadence continued collecting management fees and disbursing rents to owners.

367.    LeFevre and Cadence knew or should have known that rents were not being paid from revenue generated on Noah's Carmel.

368.    LeFevre and Cadence knew or should have known that rents were being paid with funds collected by new investors.

369.    At all relevant times, Ashby, Nelson, Beynon, and Rutherford were agents of and officers of Rockwell, and by committing the acts described in this Complaint and by failing to act when required to do so, Ashby and Nelson were acting in the course and within the scope of their authority as agents and officers, and in the transaction of the business of the employment or agency.

370.    At all relevant times, Hamrick and Brown were agents of and officers of E&W, and by committing the acts described in this Complaint and by failing to act when required to do so, Hamrick and Brown were acting in the course and within the scope of their authority as agents and officers, and in the transaction of the business of the employment or agency.

371.    At all relevant times, Bowser was an agent of and officer of Noah's and Gabriel Construction, and by committing the acts described in this Complaint and by failing to act when required to do so, Bowser was acting in the course and within the scope of his authority as an agent and officer, and in the transaction of the business of the employment or agency.

372.     At all relevant times, DeSalvo was an agent and officer of Belle Isle, and by committing the acts described in this Complaint and by failing to act when required to do so, DeSalvo was acting in the course and within the scope of his authority as an agent and officer, and in the transaction of the business of the employment or agency.

373.     Defendants' tortious conduct from July 2018 to March 2019, as described in this Complaint, was committed within the scope of their employment and in furtherance of their employers' interests.

374.     Defendants' employers are therefore also liable to Plaintiffs for Defendants' acts and omissions as alleged in this Complaint.

## FIRST CAUSE OF ACTION
### (Negligent Misrepresentation Against Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)

375.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

376.     Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affect or relate to the condition of the real property and to disclose truthful and complete, rather than misleading, information.

377.     Including the foregoing false representations, Defendants made the following non-exhaustive negligent representations to Plaintiffs:

a.   Rockwell TICs are not securities;

b.   Noah's Carmel was secured by Noah's, an excellent corporate tenant;

c.   Plaintiffs' investment was safe and secure with reliable income from Noah's as tenant;

d.   The TIC investment in Noah's Carmel qualified as a 1031 Exchange;

e.   Noah's paid the property tax;

    f.    "All of the companies that are the tenants in [Rockwell] properties are thriving despite the down economy;"

    g.    "The worst-case scenario would be if the tenant went out of business and there was an interruption in the lease payments;"

    h.    [B]ecause there is no debt to service you would not be in danger of losing the property and thereby your original investment;"

    i.    "Rockwell properties are smaller, freestanding buildings which are typically much easier to lease than a larger facility;" and

    j.    Rockwell's "track record is literally perfect as not a single Rockwell client has ever missed a monthly lease payment."

378.    Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

379.    Defendants knew such representations were false or were negligent in making such representations.

380.    Defendants were negligent in inspecting the condition of the real property.

381.    Defendants knew or should have known the misrepresentations were false and knew about the omissions based on their years of experience doing business with Noah's and selling TIC interests. Based on that experience, they knew Noah's Carmel was not capable of generating the level of revenue needed in order to pay Plaintiffs rents and that Noah's would not be able to complete construction on time.

382.    These Defendants made the misrepresentations in an effort to induce the Plaintiffs into purchasing Noah's Carmel for a grossly inflated price.

383.     The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase Noah's Carmel. Plaintiffs would not have invested in the TIC interests had they known the true facts.

384.     Plaintiffs justifiably relied on the foregoing misrepresentations and on the expectation that information necessary to render representations not misleading would not be omitted from the Noah's Carmel Sales Package. The Noah's Carmel Sales Package was presented as an accurate and complete disclosure of facts relating to investment in the TIC Interests and of the risk factors associated with the investment.

385.     Plaintiffs' reliance was justified in light of the knowledge and experience these Defendants had with respect to Noah's Carmel, Noah's' potential to generate revenue, Noah's' previous construction schedules, and their experience selling TIC interests.

386.     As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Negligence Against Hamrick and E&W)**

387.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

388.     Hamrick and E&W owed a duty of care to DiTucci, Hennessey, the LaRozas, the Roses, Hertrich, the Roberts, and each of their respective entities to conduct the property transactions in compliance with a 1031 Exchange; to ensure that they were not considered an unqualified person as defined by the Internal Revenue Code; to transfer to FATCO funds for Plaintiffs; to perform due diligence regarding Noah's Carmel and ensure that the conveyance was valid; to ensure that a reciprocal trade or actual exchange took place in each exchange transaction; and to acquire Noah's Carmel.

389.    Hamrick and E&W owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

390.    Hamrick and E&W breached their duty of care by failing to perform the transaction to comply with the requirements of a 1031 Exchange, did not properly transfer funds to FATCO, failing to make a reciprocal trade or actual exchange, and did not validly acquire Noah's Carmel.

391.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty Against Ashby, Nelson, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)**

392.    By this reference Plaintiffs incorporate all other allegations in this Complaint.

393.    Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

394.    Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs and Noah's Carmel. The TIC investment structure and IRS rules made Plaintiffs weaker parties with unique vulnerabilities, including, *inter alia*, that Plaintiffs were prohibited from actively managing their investments.

395.    Defendants accepted that trust and confidence from Plaintiffs.

396.    Plaintiffs depended on Defendants to manage Noah's Carmel according to the Contracts.

397.    Defendants were also Plaintiffs' agents.

398. Defendants also had access to superior and exclusive knowledge about Noah's that Plaintiffs did not have, such as information about the financial performance of Noah's and the flow of funds to and from Noah's.

399. Defendants breached their fiduciary duties to Plaintiffs by misappropriating funds from Noah's Carmel, concealing the misappropriation, and/or failing to alert Plaintiffs to the misappropriation.

400. Defendants' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

401. As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
**(Fraud/Constructive Fraud Against Bowser, Hamrick, Brown, E&W, Rockwell, Rockwell Indianapolis, Ashby, Beynon, and Nelson)**

402. By this reference, Plaintiffs incorporate all other allegations in this Complaint.

403. In addition to the foregoing, Defendants made false statements about important facts regarding Noah's Carmel, including:

    a.  The representations within the Sales Package;

    b.  The representations made to each individual Plaintiff, as described above;

    c.  Selling TIC interests in Noah's Carmel to Plaintiffs Edward A. Hennessey 2001 Revocable Living Trust on June 19, 2018; CAMAC June 21, 2018; and the Russell E. Hertrich Revocable Trust on June 22, 2018 for a total of over $2,219,000 before Noah's Carmel had been conveyed to Rockwell Indianapolis on June 27, 2018;

d.  Noah's Carmel was secured by the Lease with NOAH'S OPERATIONS

CARMEL, LLC, a Utah limited liability company that did not exist; and

e.  The Lease began on June 13, 2018 before Noah's Carmel had been conveyed to

Rockwell Indianapolis on June 27, 2018.

404.  Defendants made the statements knowing that they were false.

405.  Alternatively, Defendants made the statements recklessly and without regard for

their truth.

406.  Defendants intended that Plaintiffs would rely on the statements.

407.  Plaintiffs reasonably relied on the statements.

408.  As a result of Defendants' conduct, Plaintiffs suffered damages as a result of

relying on the statements.

**FIFTH CAUSE OF ACTION**
**(Negligence Against Parkin and FATCO)**

409.  By this reference, Plaintiffs incorporate all other allegations in this Complaint.

410.  Parkin and FATCO were obligated to use the ordinary skill and diligence of title

insurers, closing agents and escrow agents in conjunction with the performance of their duties in

connection with the purchase and sale of the Plaintiffs' TIC interests.

411.  Parkin and FATCO held themselves out as experts in 1031 transactions and

represented that they were fully qualified and knowledgeable with respect to the specific

requirements of 1031 exchange transactions.  At all relevant times Parkin was an agent of

FATCO and acted on its behalf.

412.  At the closing of each Plaintiffs' purchase of an interest in a Noah TIC Property,

funds were delivered from an Accommodator or Qualified Intermediary for the Plaintiff to a

FATCO trust account.  Parkin and FATCO functioned as escrow agent for the deposited funds.

413.    In the absence of an escrow agreement and pursuant to Indiana and other relevant law, an escrow agent is required to act pursuant to the Purchase Agreement, addendums thereto and attorney instructions.  Indeed, FATCO has admitted to Plaintiffs that they were responsible for ensuring that funds were only disbursed in strict compliance with the terms of the Purchase Agreement and other instructions by the parties.

414.    The Purchase Agreement required that the Seller, Rockwell, was to "periodically provide statements to First American Title Company detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds."

415.    Parkin and FATCO, as title, closing and escrow agents for the sale of the Carmel real Property to Rockwell, knew that the total purchase price of the Carmel real Property was approximately $675,000.

416.    Parkin and FATCO knew that no construction had occurred on the Carmel Property.  Parkin and FATCO received no statements detailing construction costs from Rockwell.  Notwithstanding the complete absence of any construction on the Carmel Property, Parkin and FATCO disbursed $6.26 million dollars to Rockwell when the market value of the purchased vacant land was no more than $675,000.

417.    Parkin and FATCO failed to perform their duties in compliance with internal and industry standards and, e.g., did not record deeds until, in several cases, more than six months after the "closing" and not until contacted by Plaintiffs or Plaintiffs' counsel.  Parkin and FATCO intentionally withheld these deeds as party of the fraudulent scheme to present the construction TICs as 1031 compliant.  When asked about the cause of the delay in registering and transferring deeds, Parkin and FATCO made up explanations including that the deeds were "lost in the mail" or that the "file had been misplaced" in order to cover up the fraud.

418.    Parkin and FATCO intentionally withheld statutorily mandated Indiana Sales Disclosure Forms at closing as part of the conspiracy to defraud the Plaintiffs.

419.    As escrow agent in each transaction, Parkin and FATCO had a duty to use their utmost skill and diligence to safeguard Plaintiffs' escrowed money and only to disburse those funds in strict compliance with the strictures of the Purchase Agreement and applicable 1031 requirements.

420.    Parkin and FATCO disregarded their obligations and disbursed the full amount of Plaintiffs' investment knowing that no construction had occurred and in violation of the terms of relevant instructions to Parkin and FATCO.

421.    As a result of Parkin and FATCO's malfeasance, Plaintiffs' money was misappropriated by FATCO's co-conspirators and was not used for its intended purpose.

422.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial but not less than $5,000,000.

### SIXTH CAUSE OF ACTION
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder Against Ashby, Nelson, Hamrick, Rockwell, Rockwell Indianapolis, and E&W)**

423.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

424.    Defendants made untrue statements of material fact and omitted material facts necessary in order to make the statements not misleading, as alleged above, in violation of Rule 10b-5 and subsections a, b and c thereunder.

425.    The material misrepresentations and omissions were made in connection with the offer to sell a security. Many of the material misrepresentations and omissions were made in the Sales Package.

426.     The Sales Package was distributed by Ashby, Beynon and Nelson in furtherance of the fraudulent scheme.

427.     In addition to the foregoing, the misrepresentations or omissions in the Sales Package include:

a.   The Risk Analysis of Noah's;

b.   The Average Cap Rate of 8.50% over the initial lease term;

c.   That Noah's was a single, independent financial entity;

d.   That Rockwell's TIC offerings did not constitute securities; and

e.   That federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests.

428.     Such omissions include, without limitation;

a.   The financial health of Noah's and Noah's other properties;

b.   The extent to which Noah's Carmel's revenue was dependent on Noah's;

c.   The status of construction on the proposed building;

d.   The costs of constructing the building; and

e.   Defendants' commissions.

429.     Defendants all made the material misrepresentations and omissions because they all actively contributed to the drafting of the Noah's Carmel Package, Indiana Sales Disclosure Form, Purchase Agreement Property, TIC Agreement, and/or Administrator Agreement or distributed those materials for the purpose of recommending or selling the Carmel securities.

430.     Bowser knew the misrepresentations were false and knew about the omissions based on his years of experience owning and/or operating Noah's and Gabriel Construction. Moreover, Noah's and Gabriel Construction knew that the misrepresentations were false and

knew about the omissions because they are imputed with the knowledge of their principals. Bowser intended to deceive the Plaintiffs by making these misrepresentations and omissions.

431.   Ashby and Nelson knew the misrepresentations were false and knew about the omissions based on their years of experience owning and/or operating Rockwell and entering into lease agreements with Noah's. Moreover, Rockwell and Rockwell Indianapolis knew the misrepresentations were false and knew about the omissions because they are imputed with the knowledge of their principals. These Defendants intended to deceive the Plaintiffs by making these misrepresentations and omissions.

432.   Hamrick and Brown knew, or were reckless in not knowing, that the representations were false and knew about the omissions based on their years of experience owning and/or operating E&W, offering Rockwell and Noah's properties for sale to investors, and facilitating sales as QI. Moreover, Rockwell and E&W knew the misrepresentations were false and knew about the omissions because it is imputed with the knowledge of its principals. These Defendants intended to deceive the Plaintiffs by making these misrepresentations and omissions.

433.   Rockwell and Rockwell Indianapolis knew the misrepresentations were false and knew about the omissions because they are imputed with the knowledge of their principals. LeFevre intended to deceive the Plaintiffs by making these misrepresentations and omissions.

434.   The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase Noah's Carmel. The Investors would not have invested in the TIC Interests had they known the true facts.

435.   Plaintiffs justifiably relied on the foregoing misrepresentations and on the expectation that information necessary to render representations not misleading would not be

omitted from the Noah's Carmel Package and Hamrick's sales pitch. The Noah's Carmel Package and Hamrick and Brown's sales pitch were presented as an accurate and complete disclosure of facts relating to investment in the TIC Interests and of the risk factors associated with the investment.

436.    The statutory safe harbor and bespeaks caution doctrine that apply to forward looking statements under certain circumstances do not apply to the Noah's Carmel Package because no meaningful cautionary statements were made regarding material risks and facts known by Defendants, including:

a.    The financial health of Noah's and Noah's other properties;

b.    The extent to which Noah's Carmel's revenue was dependent on Noah's;

c.    The status of construction on the proposed building;

d.    The costs of constructing the building; and

e.    Defendants' commissions.

437.    The foregoing misrepresentations and omissions caused the owners to suffer extensive damages in an amount to be proven at trial but in excess of $4.9 million.

### SEVENTH CAUSE OF ACTION
**(Violations of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l, and Section 5 thereunder Against Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)**

438.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

439.    From approximately June 26, 2018 through the present, Defendants unlawfully made use of means or instruments of communication in interstate commerce or of the mails for the purpose of offering, selling, or delivering unregistered securities in direct violation Section 5(a) and 5(c) of the Securities Act.

440.    The sale of TIC interests in Noah's Carmel was the sale of unregistered securities in that an investment of money was required in order to receive the TIC interest, the investment of money was made into the common enterprise that is Noah's Carmel and the Lease with Noah's, and the success of the investment and any potential returns on such was entirely reliant on Defendants' ability to pay the promised rents and so-called "CAP rate."

441.    Defendants sold or offered for sale the securities at issue without filing a registration statement.

442.    As such, Defendants have participated in an unregistered sale of securities in violation of the Securities Act and are liable to Plaintiffs for rescission and/or compensatory damages.

## EIGHTH CAUSE OF ACTION

**(Sale of Securities by an Unlicensed Broker or Investment Adviser: Cal. Corp. Code §§ 25210 and 25501.5; Florida Statutes 517.301, K.S. Stat. § 17-12a509; Maine Rev. Stat. §16509; Mass. Gen. Laws ch. 110A et seq.; and N.H. Rev. Stat. § 421 Against Ashby, Nelson, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)**

443.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

444.    Defendants offered and sold securities to investors in, at least, Massachusetts, California, New Hampshire, Florida, Maine, and Kansas.

445.    At the time of Defendants' sales, they were not licensed under any relevant state statute, and the sales were therefore illegal and in violation of the relevant securities laws of each state in which each Plaintiff resides.

446.    Defendants sold securities knowing or recklessly not knowing that the TIC interests were securities, and that they were not licensed to sell securities.

447.    As a result, Defendants are liable to Plaintiffs for the consideration paid for the security, interest at the legal rate of interest from the date of payment, costs, and reasonable attorney's fees.

## NINTH CAUSE OF ACTION

**(Violations of Plaintiff States Blue Sky Laws: Mass. Gen. Laws ch. 110A, § 410; Cal. Corp. Code §§ 25401, 25501, and 25504; N.H. Rev. Stat. Ann. § 421-B:5-501; Florida Statutes 517.301; K.S. Stat. § 17-12a509; and 32 Maine Rev. Stat. § 16509 Against Ashby, Nelson, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)**

448.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

449.    Defendants offered to sell the Security in, at least, Massachusetts, California, New Hampshire, Florida, Maine, and Kansas.

450.    Under these state securities laws, Defendants had a duty to fully and accurately disclose all material facts that a reasonable investor would consider important in making the decision to invest in securities. Instead, Defendants made untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading in connection with the offer and sale of securities.

451.    Each of the Defendants personally participated in the preparation of the Securities Offerings, by either drafting substantial portions of them, reviewing and commenting on them, or personally publishing them, as described more fully above.

452.    Alternatively, Defendants materially aided in the sale of the securities.

453.    Each of the Securities Offerings failed to disclose all material facts that a reasonable investor would consider important in making the decision to invest in the securities, and contained untrue statements of a material fact in violation of Mass. Gen. Laws ch. 110A, §

410; California Corporations Code §§ 25401, 25501, and 25504; N.H. Rev. Stat. Ann. § 421-B:5-501, Florida Statues 517.301, K.S. Stat. 17-12a509 and 32 Maine Rev. Stat. § 16509.

454.    The investors in the Securities Offerings did not know of these material misstatements or omissions.

455.    Defendants knew, or in the exercise of reasonable care, could have learned of these misstatements or omissions.

456.    As the result of the material misrepresentations and omissions in the above offerings, the investors in such offerings have been damaged.

457.    Each of the Defendants is a partner, officer, or director of the Entities, or occupies a similar status.

458.    In addition, each of the Defendants was employed by the Entities and materially aided the Entities in the sale of the Securities Offerings.

459.    By the nature of their executive positions with each of the Entities, and their active participation in the management of the Entities, Defendants directly or indirectly controlled the Entities.

460.    As such, Defendants are jointly and severally liable for the damages sustained by investors, for the Entities' sale of the Securities Offerings in violation of Mass. Gen. Laws ch. 110A, § 410; California Corporations Code §§ 25401, 25501, and 25504; N.H. Rev. Stat. Ann. § 421-B:5-501, Florida Statutes 517.301, K. S. Stat 17-12a509 and 32 Maine Rev. Stat. § 16509.

461.    In addition, as a result of their materially aiding the Debtors in the sale of the Securities Offerings, the Defendants are jointly and severally liable for the damages sustained by the Entities' investors in connection with these sales.

462.    Accordingly, Plaintiffs are entitled to an award of damages against the Defendants in the amount of the consideration the investors paid for the security, together with interest, costs, and reasonable attorney fees.

463.    Defendants acted with an actual intent to defraud or in reckless disregard of the truth or falsity of the statements in the above offerings.

464.    Because Defendants' conduct was sufficiently willful and malicious, Plaintiffs are further entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Parkin and FATCO)

465.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

466.    At all relevant times Parkin was an agent of FATCO and acted on its behalf.

467.    At the closing of each Plaintiff's purchase of an interest in a Noah TIC Property, funds were delivered from either the purchaser directly or in the cases of 1031 exchanges, by an Accommodator or Qualified Intermediary for the Plaintiff to a FATCO trust account.  Parkin and FATCO functioned as escrow agent for the deposited funds.

468.    In the absence of an escrow agreement and pursuant to Indiana and other relevant law, an escrow agent is required to act pursuant to the Purchase Agreement, addendums thereto and attorney instructions.

469.    The Purchase Agreement required that the Seller, Rockwell, was to "periodically provide statements to First American Title Company detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds."

470.    Parkin and FATCO, as title, closing and escrow agents for the sale of the Carmel real Property to Rockwell, knew that the total purchase price of the Carmel real Property was approximately $675,000.

471.     Parkin and FATCO knew that no construction had occurred on the Carmel Property.  Parkin and FATCO received no statements detailing construction costs from Rockwell.  Notwithstanding the complete absence of any construction on the Carmel Property, Parkin and FATCO disbursed $6.26 million dollars to Rockwell.

472.     As escrow agent in each transaction, Parkin and FATCO had a duty to use their utmost skill and diligence to safeguard Plaintiffs' escrowed money and only to disburse those funds in strict compliance with the strictures of the Purchase Agreement and applicable 1031 requirements.

473.     Parkin and FATCO disregarded their obligations and disbursed the full amount of Plaintiffs' investment knowing that no construction had occurred and in violation of the terms of relevant instructions to Parkin and FATCO.

474.     As a result of Parkin and FATCO's misfeasance, Plaintiffs' money was misappropriated by FATCO's co-conspirators and was not used for its intended purpose.

475.     As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, but not less than the $4.9 million invested and lost by Plaintiffs.

### ELEVENTH CAUSE OF ACTION
**(Conversion Against Ashby, Nelson, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)**

476.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

477.     From July 2018 to March 2019, Defendants wrongfully converted to their own use at least $4.9 million that was then Plaintiffs' property.

478.     Defendants were obligated to keep intact and deliver the $4.9 million in converted funds they stole.

479.     The $4.9 million in converted funds consists of specific money capable of identification.

480.     Defendants had no right to convert the $4.9 million to their own use.

481.     Plaintiffs have been permanently deprived of the $4.9 million in converted funds.

482.     As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION
### (Fraudulent Inducement Against Ashby, Nelson, Rutherford, Hamrick, Brown, Rockwell, Rockwell Indianapolis, and E&W)

483.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

484.     A confidential or fiduciary relationship existed between

    a.   Ashby, Nelson, Rockwell, Rockwell Indianapolis, and all Plaintiffs;

    b.   Rutherford, Nelson, and Bruce Rose;

    c.   Hamrick, E&W, and DiTucci;

    d.   Hamrick, E&W, and the LaRozas;

    e.   Hamrick, Brown, E&W, and the Roberts;

    f.   Hamrick, E&W, and Hennessey;

    g.   Hamrick, E&W, and Hertrich;

    h.   Nelson and Jacob.

485.     Defendants made the representations as described for each Plaintiff, above.

486.     The representations were about presently existing facts that were important.

487.     The representations were false and Defendants either knew that the representations were false or made the representation recklessly without sufficient knowledge upon which to base the representations.

488. Defendants made the representations to induce Plaintiffs to agree to the Contracts.

489. Plaintiffs reasonably relied on these representations without knowledge of their falsity.

490. Plaintiffs entered into the Contracts.

491. Plaintiffs would not have entered into the Contracts if they had known that the representations were not true.

492. As a result of Defendants' acts to induce Plaintiffs to enter into the Contracts, the Contracts are void.

493. As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

494. Defendants' conduct was and is willful or malicious, or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of Plaintiffs' rights; thus, Plaintiffs are entitled to an award of punitive damages against Defendants under Utah Code § 78B-8-201.

### THIRTEENTH CAUSE OF ACTION
#### (Breach of Contract Against Rockwell Indianapolis)

495. By this reference, Plaintiffs incorporate all other allegations in this Complaint.

496. Plaintiffs and Rockwell Indianapolis entered into written Purchase and Sale Agreements, whereby, among other things, Rockwell Indianapolis agreed to

    i. Transfer and apply the 1031 Funds to FATCO toward the construction of improvements on Noah's Carmel on the basis of invoiced construction requisitions,

    j.   Periodically provide statements to FATCO detailing the construction costs that it had incurred and seek reimbursement of such costs via transfer of funds from FATCO,

    k.   Perform closing once all of the 1031 Funds were transferred to FATCO for reimbursement of construction costs, and

    l.   Pay the escrow fees and other customary closing costs.

497.    Plaintiffs fully performed all of their obligations under the Purchase and Sale Agreements other than those obligations excused by Rockwell Indianapolis' breaches and other failures to perform.

498.    Rockwell Indianapolis materially breached the express terms of the Purchase and Sale Agreements by, among other things:

    m.   Failing to transfer funds to FATCO and apply funds toward the construction of improvements on the Noah's Carmel on the basis of invoiced construction requisitions;

    n.   Transferring all funds from FATCO on or about the date that each Plaintiff executed the Purchase and Sale Agreement prior to any construction; and

    o.   Failing to pay the escrow fees and other customary closing costs.

499.    Pursuant to the Purchase and Sale Agreements, Rockwell Indianapolis is also liable to Plaintiffs for their attorneys' fees incurred in prosecuting this claim.

500.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION
### (Elder Abuse Against Ashby, Nelson, Rutherford, Hamrick, Rockwell, Rockwell Indianapolis, and E&W)

501.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

502.    At all relevant times herein, Hennessey, Hertrich, Merklin, the Roberts, and the Roses were "vulnerable adults" as that term is defined in Utah Code § 76-5-111 and are therefore entitled to the protections provided under Utah Law.

503.    Hennessy was 73 years old on the date of purchase.

504.    The Roses were 65 years old on the date of purchase.

505.    Merklin was 71 years old on the date of purchase

506.    Sanford Roberts was 72 years old on the date of purchase.

507.    Helaine Roberts was 69 years old on the date of purchase.

508.    At all relevant times herein, Plaintiffs had a mental or physical impairment which substantially affected their ability to provide necessities; obtain services necessary for health, safety, or welfare; carry out the activities of daily living; manage their own resources; or comprehend the nature and consequences of remaining in a situation of abuse, neglect, or exploitation.

509.    Defendants were in a position of trust and confidence or had a business relationship with the vulnerable adult.

510.    Defendants knowingly, by deception, obtained or used the vulnerable adult's funds, credit, assets, or other property.

511.    Defendants intended to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the Plaintiffs' property, for their own benefit.

512.    Defendants were aware of and exploited Plaintiffs' dependency upon Defendants' purported knowledge, skills, and expertise.

513.    In order to sell the TIC investments to Plaintiffs, Defendants made misrepresentations of material facts and omitted to state facts necessary to be stated to make the facts stated not misleading, as alleged herein. Defendants were motivated by greed and intended to generate fees and commissions for themselves by causing Plaintiffs to invest while exposing Plaintiffs to an unreasonable risk of harm.

514.    On information and belief, Defendants received large commissions, fees, or other benefits on the sale of TICs to Plaintiffs.

515.    Defendants have made written and oral misrepresentations of material facts in connection with the offer and sale of the TICs for the purpose of inducing Plaintiffs to invest.

516.    In engaging in such conduct, Defendants intended to defraud Plaintiffs within the meaning of Utah's elder abuse statute.

517.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)

518.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

519.    Plaintiffs conferred a benefit on Defendants by, among other things, providing funds to Defendants for land, payment of property taxes, construction of a building, and property administrator services.

520.    Defendants appreciated or had the knowledge of the benefit by, among other things, accepting funds from Plaintiffs for land that was not worth the amount Plaintiffs paid, costs of operating Noah's, and commissions.

521.    The funds collected from Plaintiffs by Defendants were commingled and misappropriated for, among other things, personal use, costs of operating Noah's, and commissions.

522.    Plaintiffs have not been paid rents and the Noah's Carmel land sits vacant without a building..

523.    It is inequitable for Defendants to retain the benefit of the funds and other benefits conferred on them by Plaintiffs.

524.    Defendants have been unjustly enriched by retaining the benefit without reimbursing Plaintiffs.

525.    As a result of Defendants' unjust enrichment, Plaintiffs are entitled to an amount to be proven at trial.

## SIXTEENTH CAUSE OF ACTION
### (Civil Conspiracy Against All Defendants)

526.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

527.    Defendants and others known and unknown, knowingly and willfully conspired and agreed among themselves to misappropriate millions of dollars from Noah's Carmel, conceal the misappropriation, and/or not inform Plaintiffs about the misappropriation.

528.    Parkin and FATCO committed the unlawful overt acts described above in furtherance of the conspiracy.

529.    Parkin and FATCO agreed to assist the Rockwell Defendants in the fraudulent sale of Noah securities and to manipulate the transfer of deeds withhold material information and improperly disburse funds in order to further the objectives of the conspiracy. The conspiracy's objectives were to convert Plaintiffs' property; breach fiduciary duties of honesty, loyalty, and

care owed to Plaintiffs; constructively defraud/defraud Plaintiffs; and continue to collect fees for services rendered by the Defendants.

530.    The structure of the TIC investments, combined with limitations imposed by the IRS on managing TIC investments, gave Defendants undue economic influence and power over Plaintiffs, including the power to exclude and coerce Plaintiffs. Defendants' concerted action and force of numbers also served to unduly coerce and injure Plaintiffs. The conspiracy gave Defendants powers that an individual acting alone would not possess. The civil conspiracy thus constitutes an independent, actionable tort.

531.    Defendants acted wantonly and maliciously towards Plaintiffs by conspiring to steal from Plaintiffs, conspiring to conceal the theft, and/or conspiring to keep silent about the misappropriation so as to keep Plaintiffs from learning about the misappropriation.

532.    The following overt acts, among others, were taken in furtherance of the conspiracy:

a.    Ashby, Hamrick, Bowser, Nelson, Brown, Rockwell, Rockwell Indianapolis, E&W, Noah's, and Gabriel Construction misappropriated at least $4.9 million from Noah's Carmel;

b.    Parkin, while employed by FATCO, sent Plaintiffs and the Hamilton County Recorder's Office false and misleading documents regarding Noah's Carmel; and

c.    LeFevre sent false and misleading rent payments to Plaintiffs.

533.    Defendants' conduct, as perpetrated through the conspiracy, directly caused injury and damage to Plaintiffs.

534.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION
### (Materially Aiding State-Law Securities Fraud against Parkin and FATCO)

535. By this reference, Plaintiffs incorporate all other allegations in this Complaint.

536. Parkin and FATCO are liable for materially aiding and providing substantial assistance in the violation of applicable state Blue Sky laws as described above through conduct including but not limited to the following:

    a. Parkin and FATCO knowingly assisted and significantly advanced Defendants' unlawful conduct contributing to the deception of Plaintiffs by improperly disbursing funds, improperly closing transactions and recording deeds, and withholding material information as described above;

    b. Parkin and FATCO otherwise engaged in conduct materially aiding the Defendants' in accomplishing the unlawful sale of securities to Plaintiffs.

537. Parkin and FATCO knew that the sale of Noah securities was unlawful when they provided substantial assistance in the execution of the transactions.

538. Parkin and FATCO are jointly and severally liable with those Defendants committing primary violations of state Blue Sky laws. Plaintiffs are entitled to judgment against Parkin and FATCO for the loss of their investments, accrued interest and attorney fees.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

A. An award of actual and punitive damages, attorney fees and costs in an amount to be proven at trial, plus interest as set forth in the applicable statutes.

B. The imposition of a constructive trust on the transfers made to Defendants.

C. A judgment for unjust enrichment and a judgment ordering disgorgement of the purchase amounts.

D.  For pre-judgment interest, attorneys' fees, and costs of suit to the extent allowed by applicable law.

E.  In the event that the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines and fees caused by Defendants' malfeasance.

F.  Such other relief as may be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

Dated: 15 June 2020

Felix Weinberg PLLC

s/  Wesley D. Felix
*Attorneys for Plaintiffs*