IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROSA DiTUCCI, et al.,<br><br>　　　　　　　　　Plaintiffs,<br>vs.<br><br>CHRISTOPHER ASHBY, et al.,<br><br>　　　　　　　　　Defendants. | ORDER AND<br>MEMORANDUM DECISION<br><br>Case No. 2:19-cv-277-TC-JCB |

　　　　Citing the Federal Arbitration Act (FAA), 9 U.S.C § 1-14, Defendants First American Title Insurance Company ("First American") and Kirsten Parkin, an escrow agent at First American (collectively, FA Defendants), have filed a motion to compel arbitration of the claims Plaintiffs assert against them in the Third Amended Complaint.  They primarily base their motion on the arbitration clause in the title insurance policy First American issued in connection with each Plaintiff's purchase of an interest in real property in Carmel, Indiana.  But they also rely on an arbitration clause contained in each Plaintiff's agreement to purchase the interest from the real property owner.  Plaintiffs respond that the arbitration agreements are not enforceable, but even if they were, the claims do not fall within the scope of the arbitration clauses.

　　　　For the reasons set forth below, the court finds that First American may compel arbitration under the title insurance policy, that Ms. Parkin, as a non-signatory, may not, and that neither of the FA Defendants may compel arbitration under the purchase agreements.

1

## FACTS AND PROCEDURAL BACKGROUND

This case began after each Plaintiff purchased a Tenant-In-Common (TIC) interest in a real estate development project located in Carmel, Indiana (Carmel Property). Defendant Rockwell Indianapolis LLC (Rockwell) sold those interests, and each sale was memorialized in a Purchase and Sale Agreement (PSA).

Before Plaintiffs purchased their TIC interests, First American had issued a standard Owner's Policy of Title Insurance for the Carmel Property (Policy) to Rockwell. (See Policy, ECF No. 188-1.) As each Plaintiff purchased its interest in the development, First American added the Plaintiff as a "named Insured" through an individual endorsement amending the Policy. According to each endorsement, the Plaintiff's coverage was equal to its proportionate share of ownership interest set forth in its PSA. Ms. Parkin, as the escrow agent and employee of First American, handled the transactions.

When the development project failed, Plaintiffs filed suit against numerous defendants in an effort to recover their investments. On June 15, 2020, fourteen months after Plaintiffs filed their initial complaint, they filed a Third Amended Complaint, in which they added First American and Ms. Parkin as defendants. In that complaint, Plaintiffs allege five claims against the FA Defendants: Negligence, Breach of Fiduciary Duty, Unjust Enrichment, Civil Conspiracy, and Aiding and Abetting State Securities Fraud.

Plaintiffs' claims arise out of the FA Defendants' handling of the escrow account in which the Plaintiffs' purchase money was placed. According to Plaintiffs, they

> were promised that invested money would be held in escrow by First American Title Insurance Company ("FATCO") and disbursements would be made only for the purchase of land and for incremental completion of the event center. Instead, Kirstin Parkin and FATCO immediately disbursed all invested funds to their co-conspirators who then simply spent the money and performed no construction.

(Third Am. Compl. ¶ 2, ECF No. 173.)  More specifically, Plaintiffs allege that:

> Parkin understood that invested funds for construction TICs were to be held by FATCO and not disbursed until an appropriate level of construction was completed.  Parkin and FATCO ignored these fiduciary obligations and disbursed funds whenever instructed to do so by [the Rockwell Defendants or Defendant William Bowser.]
>
> In addition, Parkin and FATCO facilitated the deception of Plaintiffs:
>
>> 1) by representing to Plaintiffs that invested funds would be held safely in escrow and not fully disbursed until construction was completed;
>>
>> 2) closing on the sale of TIC interests before the subject property was owned by the seller Rockwell;
>>
>> 3) lying to Plaintiffs and telling them that they did not receive deeds to the property immediately after closing because the deeds had been "lost in the mail" or "misfiled;"
>>
>> 4) sending the deeds after closing to Rockwell and not timely recording them to assist in the deception that the purchases were somehow 1031 compliant;
>>
>> 5) withholding legally required documents from Plaintiffs at closing including legally mandated Indiana real estate disclosure forms (Indiana State Disclosure Form "ISDF").
>
> Parkin and FATCO's misconduct was done at the direction of Rockwell for the purpose of furthering the Defendants' conspiracy to defraud Plaintiffs.

(Id. ¶ 14.)

In reply to the complaint, the FA Defendants move the court to compel Plaintiffs to resolve their claims through arbitration.  In support of their motion, the FA Defendants cite to two arbitration clauses—one in the Policy and the other in each PSA—that they say are enforceable against Plaintiffs.

**The Policy's Arbitration Clause**

According to the FA Defendants, Plaintiffs are bound by the terms of the Policy because each Plaintiff's endorsement added the Plaintiff as a "named Insured" and formed an insurance contract between First American and the Plaintiff.  The Policy contains the following arbitration

clause:

> **14. ARBITRATION**
>
> Either the Company [First American] or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy.  All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. ...

(Policy ¶ 14.)  The Policy defines "Amount of Insurance" as "[t]he amount stated in Schedule A [$6,260,000], as may be increased or decreased by endorsement to this policy[.]"  (Id. ¶ 1(a), Schedule A.)

Each Plaintiff's endorsement amended the Policy and provided that the Plaintiff would be insured in an amount equal to that Plaintiff's TIC purchase price.  (See Exs. B-J Mot. to Compel Arbitration, ECF Nos. 186-4 to 186-12, collectively "Plaintiffs' Endorsements.")  The Plaintiffs' Endorsements state that they are attached to "Policy No. 910243," are "issued as part of the policy," and are "subject to all of the terms and provisions of the policy[.]" (E.g., Rosa DiTucci Mar. 29, 2019 Endorsement, ECF No. 186-4.)

Each Plaintiff's TIC purchase price and percentage interest is listed in the FA Defendants' "Percentage Chart" (attached as Appendix 1 to their motion) (ECF No. 186-2).  For instance, Plaintiff Rosa DiTucci purchased a 12.45% interest in the TIC, and First American issued an endorsement adding her as an Insured under the Policy and providing an Amount of Insurance equal to Ms. DiTucci's $779,370.00 investment.  (See Percentage Chart; Rosa DiTucci PSA at 1, ECF No. 186-13; DiTucci Endorsement.)  The insurance coverage for each of her Co-

4

Plaintiffs, calculated the same way, is less than $2 million.  (See Percentage Chart; DiTucci Co-Pls.' PSAs and Endorsements, ECF Nos. 186-5 to 186-12, 186-14 to 186-21.)

The PSAs briefly mention title insurance and an endorsement but do not contain the Policy's arbitration clause:

> **4. Title Insurance.**  At settlement, Seller [Rockwell] agrees to pay for an endorsement to the standard-coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price.  In addition, any supplementary title insurance coverage shall be at Buyer's expense.

(E.g., DiTucci PSA § 4.)  The Policy was not attached to the PSAs (and of course the endorsements were not attached because they were issued after closing).

Plaintiffs assert they were not given a copy of the Policy until after they filed suit.  In support, they offer Ms. DiTucci's declaration, a post-transaction letter from Ms. Parkin to Ms. DiTucci, and a set of post-transaction e-mails between representatives of Plaintiff Blush Property and Ms. Parkin.

Ms. DiTucci declares that before she filed this lawsuit, she "never saw, reviewed, or received the Title Commitment … and never saw, reviewed, or received the Policy[.]" (Decl. of Rosa DiTucci ¶¶ 3-4, ECF No. 192-1.)  She also submits a March 29, 2019 letter from Ms. Parkin and First American which enclosed her endorsement and warranty deed.  (Ex. 2 to Pl.'s Opp'n Mem., ECF No. 192-2.)  But Ms. DiTucci says, she "did not receive this letter until after [she] had retained counsel, learned that the deed had not been recorded, and requested the missing deed and Title Policy from Parkin and FATCO."  (DiTucci Decl. ¶ 6.)  According to First American, the documents were delayed because they "had been 'lost in the mail.'"  (Id.)

The emails, dated March 31, 2019, and April 7, 2019, were written by representatives of Plaintiff Blush Property LLC (Linda Camp-Merklin and Bryan Merklin[1]) to Ms. Parkin.  The

---

[1] See Blush Property LLC PSA (Ex. 21 to Mot. to Compel Arbitration), ECF No. 186-21.

5

representatives told Ms. Parkin they were missing copies of the Title Commitment and other documents (what those documents are is not clear because the email language is vague and the attachments are illegible). (See Ex. 3 to Pls.' Opp'n Mem., ECF No. 192-3.) Blush Property never received those documents.

Finally, Ms. DiTucci says she asked "all of [her] co-plaintiffs if any of them saw, reviewed, or received the Policy prior to filing this lawsuit. Of the Plaintiffs who responded, none of them saw, reviewed, or received it." (DiTucci Decl. ¶ 5.) She does not identify who responded to her inquiry. More importantly, the information she offers in Paragraph 5 is inadmissible hearsay. Accordingly, the court disregards Ms. DiTucci's statement about her Co-Plaintiffs' experiences.

Plaintiffs also provide a copy of Ms. DiTucci's Final Settlement Statement (Ex. 5 to Pls.' Opp'n Mem., ECF No. 192-5). The document lists the date of settlement and funds disbursement (essentially, the closing date) as September 21, 2018. It also set forth the purchase price and Rockwell's payment of $150 for title insurance to cover the property interest. That information is consistent with Rockwell's agreement in the PSA "to pay for an endorsement adding to the standard-coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price." (E.g., DiTucci PSA § 4.) Plaintiffs assert this is evidence that they did not pay consideration for the insurance so no contract was formed.

**The Arbitration Provision of the PSAs**

The FA Defendants alternatively assert that the arbitration clause in the PSAs allows them to compel arbitration. Each PSA contains a very broad arbitration provision: "Any dispute between the parties will be submitted to binding arbitration according to the Commercial Rules of the American Arbitration Association[.]" (E.g., id. at § 9.) Although the FA Defendants are

not parties to the PSAs, they rely on the doctrine of equitable estoppel, discussed below, to compel arbitration under the PSAs.

## ANALYSIS

The FAA applies to written arbitration agreements "involving commerce." 9 U.S.C. § 2. That phrase is "coextensive with congressional power to regulate under the Commerce Clause." Foster v. C.F. Turley, Jr., 808 F.2d 38, 40 (10th Cir. 1986) (citations omitted), quoted in Comanche Indian Tribe of Okla. v. 49, LLC, 391 F.3d 1192, 1132 (10th Cir. 2004). The parties do not dispute that the transactions underlying the commercial real estate development project in Carmel, Indiana, which attracted investors from across the country, affected interstate commerce. The agreements underlying those transactions—the Policy and the PSAs—are subject to the FAA's requirements.

The court must first determine whether a valid agreement to arbitrate exists. "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). To do that, the court looks to "state law principles of contract formation to tell [it] whether an agreement to arbitrate has been reached." Id. See also Hardin v. First Cash Fin. Servs., Inc., 465 F.3d 470, 475 (10th Cir. 2006) ("Generally, courts 'should apply ordinary state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute.") (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). The party resisting arbitration may raise "generally applicable contract defenses, such as fraud, duress, or unconscionability," to invalidate the arbitration agreement. Doctor's Assocs., Inc. v.

Casarotto, 517 U.S. 681, 687 (1996). Here, Indiana law applies because both the Policy and the PSA's have selected that state's law to govern disputes arising out of the contracts.[2]

If the court decides that the agreement is valid, it must then determine whether the dispute falls within the scope of that agreement. Nat'l Am. Ins. Co. v. SCOR Reinsurance Co., 362 F.3d 1288, 1290 (10th Cir. 2004). "[A]any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983). See also AT&T Techs. Inc. v. Comm'n Workers of Am., 475 U.S. 643, 650 (1986) ("'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'") (emphasis added) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960)). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985).

Plaintiffs raise a number of defenses. First they say no agreement exists because there was no offer, acceptance, or consideration. They also note that Ms. Parkin is not a signatory to the Policy and so cannot compel them to arbitrate. Second, they alternatively assert that even if the endorsements made them parties to the contract, the agreement to arbitrate is unenforceable

---

[2] The Policy contains a choice of law provision: "[T]he court […] shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court […] apply its conflicts of law principles to determine the applicable law." (Policy ¶ 17(a) (emphasis added).) In this case, Indiana law applies because the Carmel Property is located in Indiana. Similarly, the PSA contains a choice of law provision stating that the "Agreement will be subject to, and governed by the laws of the state of Indiana." (E.g., DiTucci PSA § 18.)

against them because it is procedurally unconscionable. Third, they say the FA Defendants do not have the unilateral right to compel Plaintiffs to arbitrate because the Amount of Insurance is more than $2 million, and only coverage below $2 million triggers the ability to compel. Finally, according to Plaintiffs, the scope of the arbitration clause does not encompass their claims.

For the reasons set forth below, the court finds that the Policy is an enforceable arbitration agreement that encompasses Plaintiffs' claims against First American, who has the unilateral right to compel arbitration. But Ms. Parkin, who is not a signatory to the Policy, has not established that she can compel arbitration based on the theory of equitable estoppel, so the court finds she must litigate those claims in court.

1. **Under Indiana Law, Ms. Parkin, as a Non-Signatory, May Not Compel Arbitration Under the Policy.**

Plaintiffs object to Ms. Parkin's attempt to invoke the Policy's arbitration provision because she was not a signatory to the Policy. Ms. Parkin relies on the doctrine of equitable estoppel to establish her right, even as a non-signatory, to compel arbitration.

At the time the FA Defendants filed their motion, Indiana courts allowed non-signatories to rely on a unique species of equitable estoppel. The FA Defendants cited to a set of decisions issued by the Indiana Court of Appeals to make their argument. In particular, in 2012 the appellate court held that "'[a]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" German Am. Fin. Advisors & Trust Co. v. Reed, 969 N.E.2d 621, 628 (Ind. Ct. App. 2012) (emphasis added) (quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999)). A 2020 decision, also issued by the Indiana Court of Appeals, applied the same doctrine to hold that a non-signatory could compel the signatory to arbitrate under the agreement.

9

See Doe 1 v. Carmel Operator, LLC, 144 N.E.3d 743, 757 (Ind. Ct. App. 2020) ("a nonsignatory to an agreement may bind a signatory to an arbitration clause under certain circumstances, including under a theory of equitable estoppel").  But the Doe 1 decision was appealed.

In January 2021, after the parties had fully briefed the FA Defendants' motion here, the Indiana Supreme Court reversed Doe 1 and disapproved of Reed.  See Doe 1 v. Carmel Operator, LLC, 160 N.E.3d 518 (Ind. 2021).  In that decision, the Indiana Supreme Court rejected a non-signatory's motion to compel arbitration.  When the non-signatory in Doe 1 argued that arbitration was required under the theory of equitable estoppel articulated in Reed, the Court declined "to endorse Reed's approach" or otherwise "adopt alternative theories of equitable estoppel[.]" Id. at 524.

The Court stated that the equitable estoppel theory "prevents a contracting party from making some argument or claim because it previously misled or induced a third party to act in a way contrary to how that third party otherwise would have acted." Id. at 523.  To succeed under that traditional estoppel theory, the non-signatory must establish three elements: "[T]he party claiming estoppel must (1) lack knowledge and the means of knowledge as to the facts in question, (2) rely upon the conduct of the party to be estopped, and (3) experience a prejudicial change in position based on the conduct of the party to be estopped." Id.  Short of that, no equitable estoppel applies.

The Court further opined that "if the Reed majority had considered the traditional elements [of equitable estoppel], it would have found these alternative theories of estoppel ignore one of the most important requirements for equitable relief: **reliance upon the conduct of the party to be estopped.**" Id. at 525 (emphasis in original).  It expressed concern that under the alternative theory, "there is no easily determined limit on which nonsignatories can seek to

compel arbitration. … [The doctrine] 'would sweep independent entities and even complete strangers into arbitration agreements'—an outcome the signatories didn't contemplate." Id. at 526 (quoting In re Merrill Lynch Tr. Co. FSB, 235 S.W.3d 185, 194 (Tex. 2007)).

Given the reversal of Doe 1 and the abrogation of Reed, the FA Defendants' argument no longer has merit. And nothing in the record suggests that Ms. Parkin would be able to establish the three elements of equitable estoppel. Accordingly, Ms. Parkin, as a non-signatory, may not compel Plaintiffs to arbitrate under the Policy's arbitration clause.

While splitting the claims seems like an odd result, the FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement." Moses H. Cone Mem'l Hosp., 460 U.S. at 20 (emphasis in original). The court does have some discretion to stay claims against non-arbitrating parties. See, e.g., Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1518 (10th Cir. 1995). At this point, the court is not inclined to grant a stay. But the parties may submit supplemental briefs on the issue, as described below.

In the meantime, the court analyzes the issues raised by First American, who is a signatory to the Policy.

### 2. The Policy is an Enforceable Arbitration Agreement.

Plaintiffs contend that no agreement exists, but even if it does, it is invalid because it is procedurally unconscionable. The court finds that First American has met its burden to show an enforceable arbitration agreement exists. On the other hand, Plaintiffs have not met their burden to establish procedural unconscionability.[3]

---

[3] "'A motion to compel arbitration is analogous to a motion for summary judgment. The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration.... After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.'" Brumley v. Commonwealth Bus. Coll. Educ. Corp., 945

11

      a.   <u>Plaintiffs are Parties to the Policy.</u>

Plaintiffs say no contract was formed because "[t]here was no offer, acceptance, or consideration[.]" (Pls.' Opp'n Mem. at 4, ECF No. 192.)

An insurance policy is subject to the same rules governing the formation of other types of contracts. "[I]n order to form a valid insurance contract, there must be a meeting of the minds upon all the necessary elements such as the subject matter, the risk insured against, the amount, the duration of the risk and the premium." <u>Am. United Life Ins. Co. v. Rest. Hospitality Ass'n of Ind.</u>, 898 N.E.2d 419, 425 (Ind. Ct. App. 2008). A party's acceptance of the offer of insurance "may be evidenced by acts, words, or deeds of the insured which show an intent to accept, and any such facts showing a meeting of the minds will support a finding of the existence of a contract." <u>Id.</u>

The record shows an offer of insurance and acceptance of that coverage. Plaintiffs were told they would receive title insurance. (<u>See</u> PSAs § 4.) Each closing included payment of a $150 premium for title insurance covering the property, as indicated in the settlement statement.[4] The closing documents specifically describe the subject matter (the property interest) and its value. The insured risk was clearly identified. By closing on the sale, Plaintiffs essentially applied for title insurance. The endorsements show that First American issued the insurance. "When an application for insurance is submitted and that application is accepted by writing a

---

N.E.2d 770, 775 (Ind. Ct. App. 2011) (quoting <u>The Dunes of GP, L.L.C v. Bradford</u>, 966 So.2d 924, 926 (Ala.2007)) (quotations and citations omitted). <u>See also</u> <u>Geneva-Roth, Capital, Inc. v. Edwards</u>, 956 N.E.2d 1195, 1199 (Ind. Ct. App. 2011) (party seeking arbitration bears burden to show an enforceable arbitration agreement exists whereas party raising unconscionability as a defense bears burden to show the agreement is invalidated).

[4] Although Plaintiffs only attach Ms. DiTucci's closing documents as evidence, they represent that her settlement statement is like the other Plaintiffs' settlement statements. "Each PSA states that Rockwell Indianapolis LLC agreed to pay for an endorsement to the Policy and Plaintiffs' Final Settlement Statements reflect that." (Pls.' Opp'n Mem. at 5.)

policy that conforms to the application, there is a valid policy of insurance." Am. United Life Ins. Co., 898 N.E.2d at 425.

Plaintiffs assert the contract was not supported by consideration because Rockwell paid the premium. But the important fact is that Rockwell paid the premium for each Plaintiff's coverage, not for its coverage. The money (whatever the source) bought insurance for Plaintiffs. That payment was sufficient consideration.

Because all of the requirements for formation of a contract have been satisfied, the court finds that each endorsement formed a contract between each Plaintiff and First American.

  b. The Contract is Not Procedurally Unconscionable.

Plaintiffs raise the defense of procedural unconscionability. "A contract is unconscionable if a great disparity in bargaining power exists between the parties, such that the weaker party is made to sign a contract unwillingly or without being aware of its terms." Brumley v. Commonwealth Bus. Coll. Educ. Corp., 945 N.E.2d 770, 777 (Ind. Ct. App.2011). "[P]rocedural unconscionability involves the manner and process by which the terms become part of the contract." Missler v. State Farm Ins. Co., 41 N.E.3d 297, 303 (Ind. App Ct. 2015), quoted in Doe 1, 144 N.E.3d at 753.

Plaintiffs have not satisfied their burden to show that issuance of the title policy endorsement was procedurally unconscionable. They were on notice that they would receive title insurance for the property through an endorsement to an already existing policy.

> **4. Title Insurance.** At settlement, Seller [Rockwell] agrees to pay for an endorsement to the standard-coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price. In addition, any supplementary title insurance coverage shall be at Buyer's expense.

(E.g., DiTucci PSA § 4.)

They had sufficient time to request and review the Policy before closing. For instance, Ms. DiTucci executed her PSA on September 17, 2018. She closed four days later on September 21, 2018. (See Final Settlement Statement at 1, Ex. 5 to Pls.' Opp'n Mem., ECF No. 192-5 (listing the settlement and disbursement dates as September 21, 2018).) As for the other Plaintiffs, they do not provide copies of their own settlement statements. But they have also not provided evidence showing their situations (i.e., opportunity and time to review the Policy) were fundamentally different from Ms. DiTucci's.[5]

After closing, First American issued the endorsements, which specifically identify the Policy. Each endorsement incorporates the Policy by reference and states that it is "[a]ttached to Policy No. 910243 [i]ssued by First American Title Insurance Company," is "issued as part of the policy," and amends the Policy by adding the individual as a named insured. (E.g., DiTucci Endorsement.) Even if the Plaintiffs did not receive copies of their endorsements until much later,[6] that does not diminish the notice Plaintiffs received when they signed their PSAs.[7] The

---

[5] Plaintiffs point out that the Policy did not exist when three of the Plaintiffs—Hennessey, Hertrich, and CAMAC—signed their PSAs. (See Pls.' Opp'n Mem. at 9.) The Policy was issued on July 3, 2018. Hennessey executed its PSA (ECF No. 186-19) on June 13, 2018. Hertrich and CAMAC executed their PSAs on June 22, 2018 (ECF Nos. 186-16, 186-20). But Plaintiffs do not indicate when those three Plaintiffs closed on their purchases. Each PSA indicates that closing would take place by July 6, 2018, a date after the Policy was issued. Without knowing the date of closing, the court cannot determine whether the three Plaintiffs would have been able to request and review the Policy. It is possible that, if closing occurred after July 3, 2018, they would have had the ability to review the language before finalizing the transaction. Because Plaintiffs do not provide the information necessary to make that determination, and because it is their burden to do so, the court cannot find that those three Plaintiffs did not have sufficient notice and ability to review the terms of the Policy.

[6] The record does not clearly indicate who received what and when.

[7] Plaintiffs take issue with how and when the FA Defendants communicated and provided documents after the PSAs were signed and the property purchased. But nothing in the record shows anything procedurally out of the ordinary through the time of closing. The treatment Ms. DiTucci and her Co-Plaintiffs received after closing is not relevant to the narrow issue now before the court.

PSAs expressly stated that another legal document—a title insurance policy—would govern part of the transaction.

The TIC transactions were relatively sophisticated tax and real estate transactions. Each Plaintiff initialed language in the PSAs acknowledging that "it has been advised to obtain independent tax and legal advice regarding the transaction described herein…." (E.g., DiTucci PSA § 3.5.) Moreover, Section 12 of each PSA emphasized that the Plaintiff had the responsibility to perform its own due diligence before signing the PSA:

> REAL ESTATE TRANSACTIONS ARE COMPLEX; THE SELLER DOES NOT REPRESENT YOU AND CANNOT GIVE YOU LEGAL ACCOUNTING OR REAL ESTATE ADVICE. PLEASE REVIEW ALL DUE DILIGENCE MATERIALS WITH ANY ATTORNEY OR ADVISOR OF YOUR OWN CHOOSING AT YOUR EXPENSE PRIOR TO EXECUTING THIS CONTRACT.

(E.g., id. § 12 (emphasis added).) Plaintiffs may not have obtained or reviewed the Policy's language until much later, but there is no evidence that they were foreclosed from doing so before closing. Failure to review the language before executing the PSA does not mean the process leading to issuance of the Policy was unconscionable.

### 3. First American Has the Right to Compel Plaintiffs to Arbitrate Because the Amount of Insurance is Less than $2 Million.

Pointing to the last sentence of the Policy's arbitration clause, First American asserts it has the unilateral right to compel Plaintiffs to arbitrate. That language says that "[a]ll arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured." (Policy ¶ 14.) And it asserts that each Plaintiff's amount of insurance falls below the $2 million threshold.

The Policy defines "Amount of Insurance" as "the amount stated in Schedule A [in this case, $6.26 million] as may be increased or decreased by endorsement to this policy …." (Id. ¶ 1(a).) Plaintiffs reject the notion that the Amount of Insurance is measured by the individual

15

investment, which for each Plaintiff is less than $2 million.  (See id.)  They contend that "FATCO did not issue a separate policy to each Plaintiff, and FATCO has provided nothing to show that the Amount of Insurance is anything other than $6,260,000.00." (Pls.' Opp'n Mem. at 8.)

But First American points out that each endorsement specifically refers to the amount of property interest the Plaintiff purchased.  For example, Ms. DiTucci's endorsement says "[t]he policy is amended by adding as a named Insured Rosa DiTucci (Buyer) a 12.45% undivided interest." (DiTucci Endorsement.)  It also notes that each PSA anticipated Rockwell would "pay for an endorsement to the standard-coverage owner's policy of title insurance insuring Buyer [Plaintiff] in the amount of the Purchase Price." (E.g., DiTucci PSA § 4.)

All of that, First American argues, means the endorsement decreases the Amount of Insurance to the amount of the insured's financial interest in the property.  The court agrees.  The Plaintiffs do not point to language supporting their interpretation that each Plaintiff is insured in the amount of $6.26 million.  Because the PSAs list shares less than $2 million, the First American may compel each Plaintiff to arbitrate if all other requirements for arbitration have been met.

### 4. The Dispute Falls Within the Scope of the Policy's Arbitration Clause.

Plaintiffs assert that even if they are parties to the Policy and bound by the arbitration provision, their claims falls outside the scope of claims that must be arbitrated.  The court disagrees because the arbitration clause contains very broad language:

> **Arbitrable matters may include, but are not limited to**, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or **to any other controversy or claim arising out of the transaction giving rise to this policy**.

(Policy ¶ 14 (emphasis added).)

In Plaintiffs' Third Amended Complaint, they allege Negligence, Breach of Fiduciary Duty, Unjust Enrichment, Civil Conspiracy, and Aiding and Abetting State Securities Fraud. According to Plaintiffs, they

> were promised that invested money would be held in escrow by First American Title Insurance Company ("FATCO") and disbursements would be made only for the purchase of land and for incremental completion of the event center. Instead, Kirstin Parkin and FATCO immediately disbursed all invested funds to their co-conspirators who then simply spent the money and performed no construction.

(Third Am. Compl. ¶ 2.) The FA Defendants' actions allegedly included "closing on the sale of TIC interests before the subject property was owned by the seller Rockwell," "sending the deeds after closing to Rockwell and not timely recording them to assist in the deception that the purchases were somehow 1031 compliant," and "withholding legally required documents from Plaintiffs at closing including legally mandated Indiana real estate disclosure forms[.]" (Id. ¶ 14.)

The TIC transactions included issuance of the endorsements and appointment of the FA Defendants as escrow agents, both of which gave rise to the Policy. And the allegations cited above fall into the arbitration clause's category of "any other controversy or claim arising out of the transaction giving rise to this policy." (Id.)

The broad language supports the Motion to Compel Arbitration. But to the extent there is some question about whether the claims fall within the clause (and the court does not believe there is), any doubts about its scope are to be resolved in favor of arbitration. Sanchez v. Nitro-Lift Techs., LLC, 762 F.3d 1139, 1146 (10th Cir. 2014). Because Plaintiffs allege that the FA Defendants participated in fraudulent activity underlying the TIC transactions, the court finds the arbitration clause encompasses Plaintiffs' claims.

### 5. **The FA Defendants May Not Compel Arbitration Under the PSAs.**

The FA Defendants contend they may compel arbitration through each Plaintiff's PSA, which contains a broad arbitration provision: "Any dispute between the parties will be submitted to binding arbitration according to the Commercial Rules of the American Arbitration Association." (E.g., DiTucci PSA § 9.)

Plaintiffs point out that the FA Defendants are not signatories to the PSAs. Given that fact, they say the FA Defendants may not take advantage of the PSA's arbitration requirement. The FA Defendants responded by pointing to the equitable estoppel doctrine, which, at that time, was good law in Indiana. But, as noted above, the Indiana Supreme Court has rejected the basis upon which the FA Defendants relied in their motion. For the same reasons Ms. Parkin may not, as a non-signatory, compel Plaintiffs to arbitrate under the Policy, the FA Defendants as non-signatories, may not compel Plaintiffs to arbitrate under the PSAs.

### 6. **The FA Defendants' Request for Dismissal is Denied.**

The FA Defendants ask the court to dismiss the claims in favor of arbitration. (See Mot. to Compel Arbitration at 10.) With the conclusion that Ms. Parkin's claims must stay in court, the court finds that dismissal is not appropriate.

Some courts have found that dismissing claims in favor of arbitration is fitting in certain circumstances. The Tenth Circuit has not addressed the issue, but other circuit courts have, as noted in some district court case opinions:

> The FAA provides that if any lawsuit brought in the courts is referable to arbitration under an arbitration agreement, the court shall stay the trial of the action until such arbitration has occurred. 9 U.S.C. § 3. However, where all issues between the parties are subject to and will be resolved by arbitration, the majority of federal courts have held that a stay serves no obvious purpose and dismissal is appropriate. Alarape v. Group 1 Auto., Inc., 2006 WL 2990212, at *3 n.2 (D. Colo. Oct. 19, 2006) (collecting cases and noting that Tenth Circuit has not addressed issue directly).

18

Patterson v. Lear Capital, Inc., No. 2:20-cv-251-DAK-CMR, 2020 WL 6081897, at *5 (D. Utah Oct. 15, 2020) (emphasis added).

Those cases are distinguishable because all of the claims before those courts were referred to arbitration. This case is in a different procedural posture. Given the FAA's preference for a stay of claims, see 9 U.S.C. § 3, and because Ms. Parkin will remain in court, the court declines to dismiss the claims in favor of arbitration.

## ORDER

The Motion to Compel Arbitration filed by Defendants First American Title Insurance Company and Kirsten Parkin (ECF No. 186) is GRANTED IN PART AND DENIED IN PART. Plaintiffs must arbitrate all of their claims against First American. Accordingly, the court stays those claims. But Ms. Parkin may not compel Plaintiffs to arbitrate their claims against her. The court declines at this point to stay the claims against Ms. Parkin. But the court directs the FA Defendants and the Plaintiffs to submit supplemental briefs addressing whether the claims against Ms. Parkin should also be stayed. Those briefs are due twenty-eight days from the date of this order.

DATED this 1st day of March, 2021.

BY THE COURT:

Tena Campbell
TENA CAMPBELL
U.S. District Court Judge