IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROSA DITUCCI, an individual, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTOPHER J. ASHBY, an individual, et al., <br><br> Defendants. | ORDER AND MEMORANDUM DECISION <br><br> Case No. 2:19-cv-277-TC-JCB |

Plaintiffs collectively invested $4.9 million to purchase an events center in Indiana that was to provide income from lease payments. They allege that Defendants stole their investment money and left them with tax penalties and other financial problems. Defendants are a group of interrelated individuals and companies, one of whom is William Bowser.

Plaintiffs allege that Mr. Bowser diverted $3.3 million of their investment money for his own benefit. This, they say, resulted in unjust enrichment to Mr. Bowser, which he must remedy by returning the $3.3 million.

To obtain relief, Plaintiffs have filed a motion for partial summary judgment against Mr. Bowser, who is appearing pro se. For the reasons set forth below, the motion is granted.

## STANDARD OF REVIEW

Rule 56 provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (internal quotation omitted).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d at 1215. But this rule applies only if "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

Because Mr. Bowser is proceeding pro se, the court construes his pleadings liberally. Ogden v. San Juan Cty., 32 F.3d 452, 455 (10th Cir. 1994). Still, he must comply with the procedural and evidentiary rules. Nielsen v. Price, 17 F.3d 1276, 1277 (10th Cir. 1994). If he does not, the court may not step in and be his advocate, for the court has a "limited and neutral role in the adversarial process[.]" Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998).

In his opposition brief, Mr. Bowser does not address many of Plaintiffs' factual assertions. To the extent he does, he offers evidence that is inadmissible under the Federal Rules of Evidence or that he improperly produced for the first time in his opposition memorandum.

First, Mr. Bowser has not provided a sworn statement to support his factual assertions. Without that, the court cannot consider his fact-based statements.[1]

Second, he relies on evidence that he should have disclosed to Plaintiffs during discovery. In fact, earlier this year the court found him in contempt for failing to provide that very information to Plaintiffs. (See Sept. 11, 2020 Order to Compel, ECF No. 196; Oct. 28, 2020 Pls.' Mot. for Order to Show Cause, ECF No. 208; Feb. 17, 2021 Report & Recommendation (recommending finding Mr. Bowser in contempt for failing to comply with Order to Compel), ECF No. 227; Mar. 18, 2021 Am. Order & Mem. Decision Adopting R&R (finding Mr. Bowser in contempt for failing to comply with the court's Order to Compel), ECF No. 246; Pls.' Reply in Support of Mot. for Partial Summ. J. at 3–29, 30–31 (noting that Mr. Bowser relies on evidence he did not produce during discovery), ECF No. 231.)

"If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion … unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Given the magistrate judge's order to compel, the court's findings during subsequent contempt proceedings, and the order holding Mr. Bowser in contempt, the court finds his failure to provide the information was

---

[1] Even if he had sworn under oath to the truth of his statements, much of what he asserts in his opposition brief contradicts his sworn testimony given during this court's June 7, 2019 evidentiary hearing and his June 10, 2019 deposition. Accordingly, the court would not consider it. See, e.g., Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986) (when determining whether a material issue of fact exists, a court may disregard an affidavit that conflicts with the affiant's former sworn testimony if the affidavit is an attempt to create a "sham fact issue").

neither substantially justified nor harmless. Accordingly, the court disregards that evidence and considers Plaintiffs' stated facts undisputed for purposes of the motion, as Rule 56(e)(2) allows.

## FACTS

Plaintiffs have asserted a series of claims against multiple sets of defendants. Each group of defendants had a different role in what Plaintiffs contend was a scheme to defraud investors.

One set of defendants, the Rockwell Defendants, are in the business of selling Tenant-in-Common ("TIC") investments. Such investments are considered attractive because the investors, who hold property as tenants-in-common, receive tax benefits and a steady return-on-investment through rental income.

The TIC investments here consisted of interests in real property in Carmel, Indiana, bundled with the lease of an events center that Gabriel Management Corporation, a wholly owned subsidiary of Noah Corporation, was to build and that Noah was to operate. Noah's operation of that events center—called Noah's Carmel—was designed to generate revenue from which Noah would send lease payments to Plaintiffs.

Rockwell sold the TIC interests in Noah's Carmel for $6.26 million. Of that amount, Plaintiffs invested $4.9 million, which they deposited with Rockwell. From that $6.26 million, Rockwell distributed roughly $1.2 million in commissions and purchased the real property. Rockwell transferred the remaining $5 million to Noah and Gabriel ostensibly to fund construction and development of Noah's Carmel.

As part of the TIC investment plan, Rockwell entered into a twenty-year lease with Noah, which required Noah to pay Plaintiffs rental income from operation of Noah's Carmel. Plaintiffs purchased Rockwell's interest in the lease and collectively became the landlord of the yet-to-be-constructed events center.

Mr. Bowser is President of Noah, which billed itself as a developer and operator of events centers. Noah has approximately 500 shareholders, a board of directors consisting of Mr. Bowser and two other individuals, and 480 employees. Mr. Bowser is the second largest shareholder with a holding of approximately 3.6 percent.[2]

Mr. Bowser also served as President and sole officer of Gabriel, the entity Noah charged with constructing Noah venues. Gabriel does not have a board of directors, and Noah was its only shareholder. As such, Mr. Bowser had a tremendous amount of discretion.

Each plaintiff, as an independent TIC investor, purchased an interest in Noah's Carmel at various times between June 2018 and January 2019. Although each plaintiff sent money to Rockwell at different times during that seven-month period, Rockwell, apparently anticipating receipt of the investment money, distributed approximately $5 million to Noah and Gabriel[3] before it received all of the $5 million. Rockwell disbursed the money through "construction draws" to Gabriel between June 19, 2018, and August 7, 2018.[4] The construction draws, which

---

[2] One shareholder holds slightly more than Mr. Bowser does.

[3] Mr. Bowser objects to Plaintiffs' assertion that Rockwell paid the money to Noah and Gabriel. He says "[a]ll draws were paid to DUO Venues." (Def.'s Opp'n to Mot. Partial Summ. J. at 19, ECF No. 225.) He relies on the fact that Rockwell's bank records show that Rockwell sent "Construction Draws" to "Duo (Noah's)." (Ex. 4 to Pls.' Mot. Partial Summ. J. at 2, ECF No. 221-4.) His literal reading of that evidence does not overcome his own testimony to the contrary. During the court's June 2019 evidentiary hearing, and later during his deposition, he testified that Gabriel received the construction draw money after sending invoices, or "draw sheets," to Rockwell at Mr. Bowser's direction. (Dep. of William Bowser at 80, 82, ECF No. 221-8; Tr. of June 17, 2019 Evid. Hr'g at 159–60, ECF No. 221-3.) "The draws came into Gabriel Management[.]" (Evid Hr'g Tr. at 155.)

[4] Mr. Bowser objects to a finding that the money Rockwell transferred included all of Plaintiffs' money. He points out that Rockwell transferred the $5 million before all of the Plaintiffs had given their money to Rockwell. He writes, "it is not possible for TIC owner funds to have been distributed [to fund the construction] if those funds had not yet been received by Rockwell." (Def.'s Opp'n to Mot. for Partial Summ. J. at 19.) Mr. Bowser's point is not well taken. A finding that later investors did not contribute to the $5 million construction draws would be unreasonable. First, Plaintiffs invested in the project as a whole. That included the events center that Gabriel was to build using the $5 million. Second, although Rockwell had received only a

Mr. Bowser authorized in his roles at Noah and Gabriel, purported to reflect construction costs.[5] Ultimately, despite receiving the $5 million, neither Noah nor Gabriel built the structure or otherwise developed the vacant land.

By February 2019, Plaintiffs realized they had lost their investment. As they attempted to get answers and retrieve their money, Mr. Bowser admitted during multiple communications in March 2019 that construction had not occurred. He later admitted under oath that he unilaterally diverted $3.3 million of Plaintiffs' money as he saw fit.[6] When asked why he diverted the money, he claimed that "[w]e were short on other Noah's projects that had gone significantly over budget." (Tr. of June 17, 2019 Evid. Hr'g at 155, ECF No. 221-3.) According to Mr. Bowser, he was "robbing Peter to pay Paul" and had used the money to pay operating and construction expenses at other venues that needed the cash. (Decl. of Rosa DiTucci ¶ 8, ECF No. 221-2.)

Indeed, according to Plaintiffs' financial expert, Noah's was in financial distress for years and could not pay its obligations as they became due. "For each year between 2014 and 2017,

---

portion of the $5 million at the time it transferred the money to Noah, Rockwell's bank records strongly suggest that Rockwell sent the money to Noah in anticipation that it would receive investments covering the full project cost, including the construction draws. (See, e.g., Ex. 4 to Pls.' Mot. Partial Summ. J.) Indeed, during the time Rockwell transferred the $5 million to Noah, Rockwell had received approximately $4 million in investor funds.

[5] Mr. Bowser now contends Noah did not have a construction agreement with Rockwell and, accordingly, had no obligation to spend that money on construction of Noah's Carmel. He does not present any evidence to support that assertion. He cannot reasonably dispute that Noah agreed to develop Noah's Carmel using money earmarked for that project.

[6] Mr. Bowser says his exhibits show "project completion at 35.4%" (calculated based on $1.845 million of expenses spent on a $5.213 million project cost). (Def.'s Opp'n to Mot. Partial Summ. J. at 20.) As noted earlier, the court does not rely on those exhibits because Mr. Bowser did not produce them until he filed his opposition to Plaintiffs' motion. More importantly, even if that $1.845 million went to pre-construction costs for Noah's Carmel (Mr. Bowser admits that no physical construction occurred), the remainder (according to Mr. Bowser's own numbers) exceeded $3.3 million.

Noah's incurred losses year over year ranging from $3 million to over $20 million annually. During these years, accumulated losses totaled $37 million." (Expert Report of Deepak K. Jain at 7, ECF No. 221-7.) In addition, "Noah's debt increased from $8 million in 2014 to over $18 million in 2017." (Id.) In fact, Noah was never profitable and never issued a dividend.

In May 2019, during a conference call with investors, Mr. Bowser reiterated his earlier admissions. He also said he "was a bit flip" with money that should have been used to pay Noah's Carmel property taxes (as required by the terms of Noah's lease with Rockwell) and instead used that money as a "slush fund." (DiTucci Decl. ¶ 9.)

Soon after Mr. Bowser spoke to investors, Noah declared bankruptcy. In its filing, Noah listed approximately $312,000 in assets and more than $107 million in potential claims.

As President of Noah and Gabriel, Mr. Bowser structured the companies' management and business transactions in a way that financially supported his family members, including his wife, three daughters, a stepson, a niece, a son-in-law, the brother of the son-in-law, a nephew, two brothers, and his mother.

For instance, Noah, Noah's subsidiaries, and Gabriel directly compensated many of Mr. Bowser's relatives. The companies paid Mr. Bowser's salary as well as the salaries of his wife, two daughters, son-in-law, niece, two brothers, his nephew, and his mother. (See Evid. Hr'g Tr. at 184; Dep. of William Bowser at 97–98, ECF No. 221-8.) Gabriel employed Scott Jensen, who is Mr. Bowser's son-in-law, and Brandon Jensen, who is Scott Jensen's brother.[7] They worked as project managers, and Gabriel paid each of them an annual salary of $50,000.

---

[7] Gabriel also employed Cory Lowder, who was not a relative, as a superintendent, but it appears he was the exception.

Mr. Bowser and his family members financially benefited from business that Noah and Gabriel sent to family-owned companies.  For example, Noah hired J&J Cubit Construction, LLC (J&J) to be the general contractor for Noah projects.  Scott and Brandon Jensen own J&J.  On the flip side, J&J paid $100,000 to Mr. Bowser for unspecified consulting services "over a three- or four-year period[.]"  (Bowser Dep. at 118.)

Along similar lines, Mr. Bowser's stepson partially owned Shekar & Oinos, a third-party provider to Noah Beverages.  Mr. Bowser owns Noah Beverages, which he described as "a 100-percent pass-through to Noah Corporation."  (Evid. Hr'g Tr. at 201.)

Walby LLC is another case in point.  According to Mr. Bowser, Walby "would go out and try to vet all of those properties [Noah was reviewing] and boil them down to one property that it felt like Noah Corporation could ultimately develop."  (Id. at 150.)  Mr. Bowser's wife and daughter are the members of Walby.  Mrs. Bowser, who is the managing member, had complete discretion when deciding how to spend Walby funds.  She directed payments to Mr. Bowser for his work on Walby projects.[8]

Mr. Bowser placed family members in positions that handled financial matters of Noah, Gabriel, and related entities.  A number of relatives had signing authority (typically exclusive authority) on Noah's and Gabriel's bank accounts.  Mr. Bowser and two of his daughters are signatories on Noah's bank account.  Gabriel bank account signatories included Mr. Bowser, his daughter, Scott Jensen, and Brandon Jensen.  And Mr. Bowser as well as two of his daughters had authority to make payments from the Noah Beverages bank account.

---

[8] See also Bank Statements of Rockwell, Ex. 13 to Pls.' Mot. Partial Summ. J., ECF No. 221-13 (showing Rockwell's 2018 direct payment of $23,000 to Walby during the time Rockwell sent construction draws from Plaintiffs' money to Gabriel).  Similarly, Rockwell paid $127,000 to J&J at that time.  (Id.)

Members of Mr. Bowser's family were the primary users of Noah's Divvy account (similar to a debit card) that Noah funded with large infusions of cash. As an example, after Rockwell distributed Plaintiffs' money to Gabriel, Noah replenished the Divvy account with $1 million. Mr. Bowser said he and other employees used that money to pay for travel and other company expenses. In 2018, Mr. Bowser and his wife submitted reimbursement claims totaling $93,500, all of which were round numbers and ranged from $1,500 to $36,000. The record does not contain documentation to support the substantial reimbursement payments. According to a report by the Bankruptcy Trustee's accountant, Noah did not require that users of the Divvy account provide receipts or other proofs of purchase.

Lastly, Plaintiffs assert that Mr. Bowser used some of their money to pay for construction of his Glenwild house. In 2018, the year Gabriel submitted requests for construction draws, J&J acted as the contractor overseeing construction of the Glenwild house (construction occurred between June 2017 and September 2018 and cost approximately $1.9 million). J&J did not charge a contractor's fee. During that time, two of J&J's subcontractors observed Cory Lowder, a Gabriel employee, working on the Glenwild house. Cliff Wise, one of those subcontractors, declared that Mr. Bowser paid him by transferring money from a Noah division called Customer Connect. And according to the accountant who analyzed and compiled Noah Corporation financial documents for the Bankruptcy Trustee, Mr. Bowser directed money from the construction draws to costs associated with construction of his Glenwild house. (See Jan. 11, 2021 CPA Supplemental Report to U.S. Bankruptcy Trustee for Noah Corporation at 2, ECF No. 221-9.)

Noah and Gabriel did not have reasonable accounting controls. The Bankruptcy Trustee reported that Noah's internal bookkeeping "'was never very good' and great numbers of

9

transactions could not be verified." (Dec. 5, 2020 Report of U.S. Bankruptcy Trustee for Noah Corporation at 13 n.27, ECF No. 221-6.) The Bankruptcy Trustee also noted that he was not able "to verify that proper documentation existed for reimbursement payments." (Id. at 24 n.47.) And according to the CPA's report to the U.S. Bankruptcy Trustee for Noah Corporation, "All of the funds were so co-mingled that no dollar could have been labeled as a dollar of any single entity." (CPA Supplement Report at 3.) Moreover, Noah did not create audited financial statements and did not create consolidated financial statements until its 2019 bankruptcy.

All of the evidence above, Plaintiffs assert, shows that Mr. Bowser wrongfully used their money for his own purposes and gave nothing in return. Given the intertwined nature of Noah's and Gabriel's management and finances, the substantial presence of Mr. Bowser's family members in the financial affairs of Noah and Gabriel, the companies' business relationships with entities owned by Bowser family members, the commingling of funds, and the lack of acceptable financial records, the court agrees with Plaintiffs.

## ANALYSIS

Plaintiffs seek recovery through their claim for unjust enrichment. "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." Baugh v. Darley, 184 P.2d 335, 337 (Utah 1947), quoted in Jeffs v. Stubbs, 970 P.2d 1234, 1248 (Utah 1998). To succeed, Plaintiffs must show that (1) they conferred a benefit on Mr. Bowser, (2) Mr. Bowser appreciated or had knowledge of the benefit, and (3) Mr. Bowser accepted or retained the benefit under circumstances in which it would be inequitable to retain the benefit without paying its value to Plaintiffs. Desert Miriah, Inc. v. B & L Auto, Inc., 12

P.3d 580, 582 (Utah 2000).

Plaintiffs contend they collectively conferred a benefit upon Mr. Bowser when he used $3.3 million of their investment for purposes other than construction of Noah's Carmel. That, Plaintiffs say, was a windfall to Mr. Bowser, and it would inequitable to allow him to retain the $3.3 million benefit without compensating them.

In response, Mr. Bowser argues Plaintiffs cannot satisfy their burden to show they conferred a benefit on him because Rockwell sent the money to Noah and Gabriel, and Noah and Gabriel subsequently used it to keep other struggling Noah projects alive. At most, he suggests, that shows a benefit to the corporations, not to him.

Plaintiffs reply that Mr. Bowser was the alter ego of both Noah and Gabriel, which essentially means that if Plaintiffs bestowed a benefit on either of those companies, Plaintiffs bestowed a benefit on Mr. Bowser. And, they assert, even if the court does not pierce the corporate veil, Mr. Bowser benefitted directly and indirectly when he used the money to construct his Glenwild house and to prop up Noah, which he and his family members relied upon for income.

For the reasons set forth below, the court finds that Plaintiffs have shown that Mr. Bowser, both individually and as the alter ego of Gabriel, was unjustly enriched when he diverted $3.3 million of Plaintiffs' money away from the Noah's Carmel project.

**Piercing the Corporate Veil**

Generally, shareholders, officers and directors of corporations "have no individual responsibility for the legal obligations of the corporate entity." M.J. v. Wisan, 371 P.3d 21, 35 (Utah 2016). But if the individual shareholder, officer or director "abuses the corporate form, and treats the legal entity as his alter ego, [Utah] law allows a creditor to pierce the veil." Id.

11

Using the veil-piercing doctrine, a plaintiff may "go after the assets of an individual in the unusual circumstances in which the corporate entity is not really distinct from the individual." Id.

Courts take "great caution" when deciding whether to pierce the corporate veil. Id. "Most often, the cases in which the veil is appropriately pierced involve a limited number of shareholders or trustees, or at least an unusual unity of interest and purpose." Id. As an equitable remedy, veil piercing "is available only where it is 'in the interest of justice[.]'" Id. Recognizing that veil piercing is a narrow exception to the rule, the court nevertheless finds it appropriate here.

Utah employs a two-prong test to determine whether a party may pierce the corporate veil. First, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." In other words, "the corporation is, in fact, the alter ego of one or a few individuals." Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979), quoted in Jones & Trevor Mktg. v. Lowry, 284 P.3d 630, 635 (Utah 2012). Second, "the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." Id.

The court may consider a series of non-exclusive factors when determining whether the circumstances satisfy the unity of interest element:

> (1) undercapitalization of a one-man corporation;
> (2) failure to observe corporate formalities;
> (3) nonpayment of dividends;
> (4) siphoning of corporate funds by the dominant stockholder;
> (5) nonfunctioning of other officers or directors;
> (6) absence of corporate records; [and]
> (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders[.]

Lodges at Bear Hollow Condo. Homeowners Ass'n, Inc. v. Bear Hollow Restoration, LLC, 344 P.3d 145, 150 (Utah Ct. App. 2015); Colman v. Colman, 743 P.2d 782, 786 (Utah Ct. App. 1987). These factors "are merely helpful tools and not required elements." Jones & Trevor Mktg., 284 P.3d at 636. In fact, "evidence of even one of the Colman factors may be sufficient" to support a party's alter ego theory. Id. at 638.

The court finds the second, fourth, and sixth Colman factors particularly relevant. Those, along with Mr. Bowser's self-dealing, show that Gabriel and Mr. Bowser had such a unity of interest that their separate personalities did not exist when Mr. Bowser diverted Plaintiffs' money.

Mr. Bowser disregarded the legal structure that separated Noah, Gabriel, and himself. As the sole officer of Gabriel and as President of Noah, he created and maintained blurry financial and management lines between the two companies.

Mr. Bowser failed to distinguish between Gabriel's property and his property. In a corporate veil piercing analysis, courts look at that circumstance "with extreme disfavor." Colman, 743 P.2d at 786 n.3. Mr. Bowser treated Gabriel's assets (which were commingled with Noah's) as his own. He used that money to engage in self-dealing. For instance, using the commingled assets, he hired family-owned entities (in particular, J&J and Walby), which in turn paid him consulting fees. Plaintiffs also present evidence that he used Gabriel's and Noah's personnel and money to support construction of his house.

In a veil-piercing analysis, courts also look with disfavor on the "use of corporate funds to pay personal expenses without proper accounting, and failure to maintain complete corporate and financial records[.]" Id. Those concerns exist here. At Mr. Bowser's direction, Noah and Gabriel commingled money as income flowed freely between the two. The companies had loose

financial controls. Noah had sub-standard bookkeeping and did not require users of the Divvy account, which included Mr. Bowser and his wife, to provide supporting documentation. And did not prepare audited financial statements or consolidated financial statements.

All of the above demonstrates that the "separate personalities" of Gabriel and Mr. Bowser ceased to exist. As the sole officer of Gabriel and as Noah's President, Mr. Bowser disregarded corporate and financial formalities meant to keep the corporate form of Gabriel intact. In short, Mr. Bowser was Gabriel's alter ego.

Allowing Mr. Bowser to shield his assets from Plaintiffs would sanction a fraud and promote injustice because, as discussed below, he unjustly retained a benefit from his improper use of Plaintiffs' investment money.

**Unjust Enrichment**

Courts developed the doctrine of unjust enrichment "to address situations 'that did not fit within a particular legal standard but which nonetheless merited judicial intervention.'" Desert Miriah, 12 P.3d at 582 (quoting Jeffs, 970 P.2d at 1244–45). Given the doctrine's equitable nature, "the facts underlying unjust enrichment claims vary greatly from case to case[.]" Id.

Under the circumstances, the court finds that Mr. Bowser was unjustly enriched, both as the alter ego of Gabriel and in his individual capacity, when he knowingly took money earmarked solely for Noah's Carmel and spent it to the detriment of Plaintiffs. Allowing him to retain that benefit would be inequitable.

Utah courts broadly define "benefit" to encompass "a large variety of items, … including an 'interest in money, land, chattels, or choses in action; beneficial services conferred; satisfaction of a debt or duty owed by [the defendant]; or anything which adds to [the defendant's] security or advantage.'" Emergency Physicians Integrated Care v. Salt Lake Cty.,

14

167 P.3d 1080, 1086 (Utah 2007) (quoting Baugh, 184 P.2d at 337) (alteration in original). Moreover, the benefit need not be direct. Desert Miriah, 12 P.3d at 583. Applying Utah's broad definition of benefit, the court finds that Plaintiffs conferred a direct as well as an indirect benefit on Mr. Bowser when he diverted their $3.3 million to his and his family's advantage.

At the time Gabriel took construction draws from Plaintiffs' money, Mr. Bowser put some of Gabriel's and Noah's money and resources toward construction of his home. He did so with full knowledge that Noah was financially unstable and had been for some time.

Additionally, if Noah and Gabriel failed, the substantial income they provided to him and his family members would dry up. When that livelihood was threatened, he used Plaintiffs' money to protect those interests.

The court distinguishes this situation from one in which a manager and owner of a company legitimately works to prevent failure of his source of income. Here Mr. Bowser diverted money that Plaintiffs had expressly devoted to Noah's Carmel. He did so despite his understanding that the money was not his to spend as he saw fit. He admitted as much when he told investors that by diverting their money, he was "robbing Peter to pay Paul." (DiTucci Decl. ¶ 8.) Also, Mr. Bowser's self-dealing created a web of income sources that benefitted himself and family members. By propping up other parts of Noah with funds from the Noah's Carmel project, he extended Gabriel's and Noah's ability to pay his and his family members' salaries and generate revenue for entities that family members owned or managed. Plaintiffs received nothing in return. Under the circumstances, equity requires that he repay the $3.3 million to Plaintiffs.

**ORDER**

For the reasons set forth above, Plaintiffs' Rule 56 Motion for Partial Summary Judgment

against William Bowser (ECF No. 220) is GRANTED.

DATED this 27th day of October, 2021.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge
